**In re RCM GLOBAL LONG TERM CAPITAL APPRECIATION FUND, LTD., Debtor.**

**Bankruptcy No. 96 B 42635 (TLB).**

United States Bankruptcy Court, S.D. New York.

Sept. 12, 1996.

As Corrected Sept. 18, 1996.

Cleary, Gottlieb, Steen & Hamilton by Lindsee P. Granfield, Jonathan I. Blackman, Steven M. Knecht, Carmine D. Boccuzzi, for Daiwa America Corporation.

Schulte, Roth & Zabel LLP by Jeffrey S. Sabin, Carol Weiner Levy, Harry S. Davis, Alexander J. Ornstein, Caroline Krass Levy, New York City, for RCM Global Long Term Appreciation Fund, Ltd.

Berlack, Israels & Liberman, LLP by Stephen B. Selbst, New York City, for Rowayton Capital Management, Ltd. and Rowayton Capital Management, Inc.

## MEMORANDUM OPINION ON DAIWA'S MOTION TO DISMISS

TINA L. BROZMAN, Chief Judge:

This motion to dismiss a chapter 11 case as a bad faith filing presents a bizarre twist on the more typical scenarios giving life to such requests for relief. Daiwa America Corporation ("Daiwa"), acting as a broker for RCM Global Long Term Capital Appreciation Fund, Ltd. (the "Debtor"), a foreign mutual fund, set off the Debtor's entire capital on account of the indebtedness, not of the Debtor, but of the Debtor's affiliate. This aggressive action immediately prevented the Debtor from engaging in any trades. Adding insult to injury, Daiwa now argues that the Debtor's efforts to rehabilitate by pursuing a fraudulent transfer action against Daiwa in the only available forum—this court—somehow constitutes patent bad faith such that the petition should be dismissed. What Daiwa seeks is to forever thwart the assertion on behalf of the Debtor's creditors of a collective remedy which may well be the strongest defense to Daiwa's setoff.

Daiwa's motion is grounded in § 1112(b) or § 305(a) of the Bankruptcy Code. Alternatively, Daiwa asks for the suspension of the bankruptcy case so that a pending state court action may be continued until its resolution. In the event that it does not prevail on either of its first two requests, Daiwa seeks to have the automatic stay lifted pursuant to § 362(d)(1) so that the pending state court action may resume. None of the relief Daiwa seeks is warranted.

Many of the facts were memorialized by the parties in their pretrial order as undisputed. As to the others, I conducted an evidentiary hearing on September 4, 1996.

I.

### A. The Parties

Daiwa is a Delaware corporation whose headquarters, executive office and principal place of business are located in New York, New York. In July 1994, the Debtor opened a trading account at Daiwa to buy and sell foreign exchange on a spot and forward basis and to enter into option contracts for the purchase and sale of foreign currency. The Debtor deposited nearly all of its capital with Daiwa.

The Debtor was organized as an exempt company under Bermuda law at the initiative of William S. Lipschutz, one of its shareholders, in July 1994 to engage in currency trading in the international, interbank currency markets. The Debtor was intended as a foreign regulated investment vehicle for foreign persons, be they foreign investment vehicles or foreign individuals having a high net worth.

The Debtor's Board of Directors is composed of three members: John Collis, Anthony Whaley, and Lynelle Jones. Linda Tucker is an alternate director. Ms. Jones is Lipschutz' wife and is the president of the Debtor. Messrs. Collis and Whaley are members of the Bermuda law firm Conyers Dill & Pearman ("Conyers"), and Ms. Tucker is an associate of Conyers. Conyers incorporated the Debtor at the request of Lipschutz.

Although the Debtor has officers, it has no employees, conducting its operations through paid consultants. One of these is Rowayton Capital Management, Inc. ("RCM"), a New York corporation that trades and invests in the international foreign exchange markets. RCM is the trading advisor to the Debtor, pursuant to a Trading Advisory Agreement dated July 1, 1994. RCM was founded in 1991 by Lipschutz, who is also its sole shareholder and president and chief executive officer.

Rowayton Capital Management, Ltd. ("RCM, Ltd.") is a Bermuda corporation and the manager of the Debtor, pursuant to a management agreement dated July 1, 1994 (the "Management Agreement"). RCM, Ltd. is a shareholder of the Debtor and holds 100% of the Debtor's founder shares. Lipschutz is the sole shareholder of RCM, Ltd. as well.

The Debtor's custodian since its inception has been Bermuda Commercial Bank, Ltd. ("BCB") acting pursuant to a Custodian Agreement among the Debtor, RCM, Ltd., and BCB, dated July 1, 1994. The Debtor's administrator since its inception has been International Corporate Management of Bermuda Limited ("ICMOB"), acting pursuant to an Administration Agreement among the Debtor, RCM, Ltd., and ICMOB, dated July 1, 1994.

### B. The Debtor's Shareholders

The Debtor made its shares available to investors by means of its Offering Memorandum dated July 1, 1994. With the exception of Lipschutz, the shareholders of the Debtor are foreign persons, each of which has a minimum investment of $500,000. Persons and entities interested in investing in the Debtor subscribed to shares and thereby acquired equity interests in the Debtor. The initial aggregate investment was $5,000,000 paid by 6 shareholders. Since the Debtor's inception, a total of 22 persons or entities has subscribed to shares in the Debtor, for a total investment of approximately $30.5 million; as a result of three redemptions, the Debtor currently has 19 shareholders of record. On July 26, 1995, as a direct response to Daiwa's setoff, the Debtor suspended redemptions and subscriptions.

### C. Operations of the Debtor

The Debtor began trading foreign currency exchange spots, forwards and options on July 15, 1994, after receiving proceeds for subscriptions for shares from the Debtor's initial shareholders. All of the Debtor's foreign exchange transactions have been conducted through its account at Daiwa.

On May 18, 1995, Lipschutz signed a Foreign Exchange Netting Agreement ("Netting Agreement") purportedly binding the Debtor and Daiwa. This Netting Agreement, if enforceable, arguably makes the Debtor liable for the debts of any of Lipschutz's companies to Daiwa. Three days earlier, on May 15, 1995, Lipschutz had signed an identical net-

ting agreement between RCM, which also had an account at Daiwa for foreign exchange trading, and Daiwa. RCM, RCM, Ltd. and Lipschutz were aware of the May 18 Netting Agreement when it was executed, as it was executed by Lipschutz.

Acting under the claimed authority of the Debtor's Netting Agreement, on July 24, 1995, Daiwa terminated its foreign exchange contracts with the Debtor, liquidated the Debtor's account and offset the account against the indebtedness of RCM. The Debtor disputes the validity and enforceability of the Netting Agreement.

Since July 24, 1995, the Debtor has not engaged in any trading or made any new investments. Other off-shore investment vehicles exist that, much like the Debtor, have as their principal investment objective the trading of foreign currency contracts.[1]

### D. State Court Litigation and the Ensuing Bankruptcy

On July 24, 1995, Daiwa commenced a lawsuit entitled *Daiwa America Corp. v. Rowayton Capital Management, Inc. et al.* in the Supreme Court for the State of New York, County of New York (the "State Court Action"), naming the Debtor as a defendant and seeking a declaratory judgment that the setoff was proper. Shortly after that date, the Debtor's Board of Directors created a Litigation Committee, consisting of Mr. Collis and Ms. Tucker, to consider what response the Debtor ought make.

On August 7, 1995, the Debtor answered and asserted counterclaims against Daiwa for conversion, for compensatory and punitive damages and for a declaratory judgment that Daiwa's setoff was improper. Within days, the Debtor, jointly with RCM, made a motion for partial summary judgment and for a temporary restraining order and preliminary injunction. On August 17, 1995, the State Court granted the Debtor's motion for a temporary restraining order. On August 18, 1995, the parties consensually converted the State Court's temporary restraining order into a preliminary injunction. Pursuant to

these orders, Daiwa credited the Debtor's account on its books with an amount equal to the proceeds of the liquidation and has been crediting that account with interest on a monthly basis. All account statements indicate that the account remains frozen by order of the Supreme Court of the State of New York.

On October 16, 1995, the State Court heard oral argument on the Debtor's motion for partial summary judgment and took the matter under submission. On the same date, Daiwa moved to dismiss the Debtor's punitive damages claim.

On or about October 31, 1995, an advisory committee of the Debtor's shareholders (the "Shareholders' Advisory Committee") was established to confer with, and give input and guidance to, the Litigation Committee.

On April 1, 1996, the State Court issued its decision denying the Debtor's motion for summary judgment and granting Daiwa's motion to dismiss the Debtor's counterclaim insofar as it sought punitive damages. The result of this adverse ruling on the request for summary judgment was to foist on the Debtor the time and expense necessary to conduct protracted discovery while the Debtor remained unable to raise any revenue because its entire capital had been frozen. (Not surprisingly, a number of the Debtor's professionals who rendered services during that period have sizeable claims against the Debtor's bankruptcy estate.) Faced with the ongoing cost of litigation and the inability of the Debtor to raise revenue, the Litigation Committee met with the Shareholders' Advisory Committee on several occasions to discuss, *inter alia,* the most suitable way to proceed in light of the April 1 decision. The Debtor's counsel attended a number of these meetings to discuss for the first time the possibility of the Debtor's filing for chapter 11 relief.

On May 14, 1996 (the "Filing Date"), after its Board of Directors met and authorized the filing of a chapter 11 petition, the Debtor filed its bankruptcy petition with this court.

---

1. From this fact Daiwa would like the court to extrapolate that the shareholders have no incentive to leave their capital with the Debtor when it

pursues a plan of reorganization. There is a large leap in this syllogism which I am unable to make.

### E. The Debtor's Financial Picture

The Debtor does not own or lease offices, buildings or other property. As Daiwa points out, the Debtor's chapter 11 petition states that its cash flow is zero.

RCM has asserted a claim for at least $244,709.08 against the Debtor for trading advisory services performed prior to July 24, 1995 and accrued as of July 31, 1995 pursuant to the Trading Advisory Agreement.

RCM, Ltd. has asserted a claim for at least $193,568.55 against the Debtor. $93,568.55 of this claim relate to fees for management services performed prior to July 24, 1995 and accrued as of July 31, 1995 pursuant to the Management Agreement. The remaining $100,000 represents a loan that RCM, Ltd. made to the Debtor after July 24, 1995 to assist in funding the defense of the State Court Action.

The Debtor has seven other unsecured creditors who either provided prepetition services pursuant to custodial and management agreements with the Debtor or provided legal services to the Debtor in connection with the State Court Action. All of these claims arose after July 24, 1995. An additional 12 entities included on the Debtor's list of 20 largest creditors are identified as the shareholders of the Debtor who have stated that they hold claims against the Debtor arising out of the purchase of their shares.

### F. The Debtor's Fraudulent Conveyance Complaint

From the outset of the bankruptcy, the Debtor has made known its intention to file a fraudulent transfer complaint against Daiwa. On September 3, 1996, the Debtor did so. The complaint seeks to avoid the Netting Agreement pursuant to § 548 and § 544(b) of the Bankruptcy Code and §§ 273 and 274 of the New York Debtor and Creditor Law. Among other things, the complaint alleges that:

(i) the Debtor's execution of, and entry into, the Netting Agreement constituted a fraudulent conveyance because the Debtor received less than a reasonably equivalent value in exchange for executing the agreement and was rendered insolvent and/or left with unreasonably small capital with which to continue engaging in business;

(ii) at the time Lipschutz executed the Netting Agreement to bind the Debtor to guarantee any debt owed by RCM to Daiwa, unbeknownst to the Debtor, RCM had a net deficit in the house account it maintained at Daiwa the amount of which was in excess of the Debtor's accumulated assets;

(iii) on July 24, 1995, Daiwa declared RCM in default of its house account and seized the Debtor's funds on deposit to apply them as a setoff to the deficit in RCM's house account; and

(iv) as of the date of the purported fraudulent conveyance, the Debtor had one or more creditors holding unsecured claims against it.

With these facts in mind, I now turn to the relief to which Daiwa says it is entitled.

## II.

### A. Dismissal of Chapter 11 Petition pursuant to § 1112(b)

As the movant, Daiwa has the burden of producing evidence that there is "cause" for relief under § 1112(b). Thereafter, if that burden is met, the Debtor must show that relief is not warranted. *In re Lizeric Realty Corp.*, 188 B.R. 499, 503 (Bankr.S.D.N.Y.1995). Although the term 'cause' is not defined, section 1112(b) sets forth a list, which is not exhaustive, of ten factors that can constitute cause for dismissal or conversion. *In re Gucci*, 174 B.R. 401, 409 (Bankr.S.D.N.Y.1994); *In re Cardi Ventures, Inc.*, 59 B.R. 18, 21 (Bankr.S.D.N.Y. 1985). "[T]he precise perimeters of 'cause' are intentionally omitted from the statute so as to afford maximum flexibility and, among other things, to enable a bankruptcy court to dismiss a chapter 11 case for any reason cognizable to the equity power and conscience of the court." *In re HBA East, Inc.*, 87 B.R. 248, 258 (Bankr.E.D.N.Y.1988); *In re Coffee Cupboard Inc.*, 119 B.R. 14, 17 (E.D.N.Y.1990). As a result, within the boundaries of well-settled principles, a bankruptcy judge has wide discretion to determine if cause exists and how ultimately to dispose of the case.

Although the Bankruptcy Code does not explicitly require that a chapter 11 petition be filed in good faith, many of the circuit courts have spoken on whether a bankruptcy court may, and under what standard, dismiss a voluntary chapter 11 petition at the inception of the case. *See, e.g., Carolin Corp. v. Miller,* 886 F.2d 693 (4th Cir.1989) (collecting cases); *Matter of Little Creek Development Co.,* 779 F.2d 1068, 1072 & n. 2 (5th Cir.1986) (collecting cases). Their theory is that if a petition is not filed in good faith, it is an abuse of judicial process or of the jurisdiction of the bankruptcy court. *Carolin Corp.,* 886 F.2d at 699; *In re Garsal Realty, Inc.,* 98 B.R. 140, 150 (Bankr.N.D.N.Y.1989).

■ Determining whether a petition has been filed in good faith is difficult because the very term itself, "good faith," is an amorphous notion that is largely defined by factual inquiry. *In re Laguna Assocs., L.P.,* 30 F.3d 734 (6th Cir.1994); *In re Albany Partners, Ltd.,* 749 F.2d 670 (11th Cir.1984). Because no single factor is determinative of good faith, I must examine the facts and circumstances of each case in light of several established guidelines or indicia, essentially conducting an "on-the-spot evaluation of the Debtor's financial condition [and] motives," *Laguna Assocs.,* 30 F.3d at 738; *Little Creek,* 779 F.2d at 1072 (referring to recurring patterns of conduct and facts); *In re Caldwell,* 851 F.2d 852, 860 (6th Cir.1988). It is the totality of circumstances, rather than any single factor, that will determine whether good faith exists. *In re Cohoes Indus. Terminal, Inc.,* 931 F.2d 222, 227 (2d Cir.1991); *Garsal Realty,* 98 B.R. at 151.

■ In this Circuit, a petition will be dismissed if **both** objective futility of the reorganization process **and** subjective bad faith in filing the petition are found. *Cohoes,* 931 F.2d at 227; *Gucci,* 174 B.R. at 409; *In re 9281 Shore Road Owners Corp.,* 187 B.R. 837, 855 (E.D.N.Y.1995).

■ The objective futility standard is designed to ensure that the debtor actually has a potentially viable business in place to protect and rehabilitate. Lacking this, the chapter 11 case has lost its *raison d'etre.* *Little Creek,* 779 F.2d 1068, 1073 (5th Cir.

1986). For while Congress, in enacting chapter 11 of the Bankruptcy Code, did legislate a policy of open access for debtors to the reorganization process, it is not an unbridled access. But a court should reach the conclusion that there is no demonstrable ability to reorganize only upon the strongest evidentiary showing. 5 L. King, *Collier on Bankruptcy,* ¶ 1112.03 at 1112–36 (15th ed. 1995).

Daiwa argues that because the Debtor lacks the usual indicia of an enterprise—the Debtor admits it has no employees, no current operations, or cash flow—it cannot be rehabilitated and cannot propose a confirmable reorganization plan. Normally we hear these plaints where a single-asset debtor, faced with foreclosure, seeks bankruptcy protection to stave off losing its property. *See, e.g., Little Creek,* 779 F.2d at 1068; *Cohoes,* 931 F.2d at 227; *9281 Shore Road,* 187 B.R. 837; *In re Con Am Grandview Assocs., L.P.,* 179 B.R. 29 (S.D.N.Y.1995). As the Debtor has argued, it does not fit this recurring pattern; it is a mutual fund which can operate without the need of hiring many employees, investing in equipment, leasing office or factory space, or purchasing services or goods from outside vendors, all the traditional indicia of a typical corporate enterprise. All the Debtor needs to operate are investors to supply it with funds to invest and vehicles in which to invest the funds.

The Debtor's situation is distinguishable from two cases cited by Daiwa. The first of these is *In re D & F Meat Corp.,* 68 B.R. 39 (Bankr.S.D.N.Y.1986), in which the debtor suffered two fires, with the second one destroying all of the debtor's assets under mysterious circumstances. As a result, it had no business to reorganize or rehabilitate. All that remained was a questionable fire insurance claim (because of the suspicion of arson) which D & F hoped to liquidate to pay its creditors and principals. D & F did not state it intended to reorganize, *id.* at 41, unlike the Debtor, which has stated that it intends to resume business operations once the Daiwa lawsuit is resolved. Importantly, the judge in *D & F Meat Corp.,* found that D & F was already in poor financial condition prior to the second fire, for it owed 3 months'

back rent to its landlord and judgments had been filed by creditors. *Id.*

Daiwa presented no evidence as to the prepetition financial condition of the Debtor prior to the setoff. I mention this because a common theme in the cases cited by Daiwa, including *D & F Meat Corp.*, is the dire financial straits of each debtor prior to its filing for bankruptcy which influences the judge to find that the filing was the last gasp of a dying enterprise. Although the Debtor claims in its response that it was generating a substantial profit, it did not provide any evidence to support this. Nonetheless, I think I can safely infer from Daiwa's silence on this point as well as the fact that the Debtor filed no insolvency proceedings in Bermuda that the Debtor was not facing an extreme financial situation but was stopped dead in its tracks by Daiwa's setoff.

In the second of Daiwa's cases, *In re Southern California Sound Sys., Inc.*, 69 B.R. 893 (Bankr.C.D.Cal.1987), a newly-formed, non-operating corporation filed for chapter 11 relief within two months of incorporating solely to escape litigating a state court specific performance action. The court dismissed the petition because the debtor impermissibly attempted to use the Bankruptcy Code to create an estate rather than to preserve one. *Id.* at 898. Here, the Debtor was operating for a year previously before the setoff, and its goals are to preserve its estate by regaining possession of the nearly $34 million in cash in escrow, resume operations and reorganize. *See also, In re Johns–Manville Corp.*, 36 B.R. 727 (Bankr.S.D.N.Y.1984) (describing debtors that abuse bankruptcy proceedings as those which typically were formed for the sole purpose of filing for bankruptcy protection or which never operated legitimately).

█ It is important to note that the objective futility test is directed at "rehabilitation" of the Debtor and not "reorganization." In the bankruptcy context, the former term means " 'to put back in good condition; re-establish on a firm, sound basis.' " *In re Lizeric Realty Corp.*, 188 B.R. 499, 503 (Bankr.S.D.N.Y.1995) (quoting 5 *L. King, Collier on Bankruptcy*, ¶ 1112.03 at 1112–19 (15th ed. 1995)). And that is what John

Collis, testifying on behalf of the Debtor, stated is its goal, the re-establishment of the fund on a firm, sound basis to continue its enterprise. While Collis conceded that he himself has no personal experience in foreign trading, he did testify that prior to the Filing Date he had had some discussions with the Shareholder Advisory Committee concerning the future form of the Debtor including whether new advisors and account managers should be employed, presuming that it regains the use of its funds. The postpetition actions were consistent with the prepetition discussions. Collis attempted postpetition to identify suitable substitutes for the Lipschutz entities which were providing services to the Debtor.

Daiwa makes much of the fact that the Debtor's Offering Memorandum, dated as of July 1, 1994 and still in effect, states in part that if the Debtor severs its trading relationship with RCM, the Debtor's Board of Directors will recommend liquidation to the shareholders. Offering Memo at ¶ 16. This is offered to support Daiwa's contention that without Lipschutz' expertise or involvement, the Debtor cannot resume operations. But although this agreement is still in force, it dates back to the origination of the Debtor. Circumstances change, and it is not unusual for a board of directors to act independently of a company's founder in pursuit of its fiduciary duty. By filing for chapter 11 protection, the Debtor's board has already demonstrated its ability to act independently of Lipschutz, and this behavior supports Collis' testimony that the board need not follow slavishly the terms of the Offering Memorandum.

As a final note on the objective bad faith standard, Daiwa argues strenuously that if the Debtor should prevail and regain possession of the funds that are currently frozen, its shareholders will simply liquidate the funds and deploy them elsewhere. However, this is pure speculation on Daiwa's part; no probative evidence has been offered.

The Debtor's business is viable, but whether it will have access to the funds which are a predicate to its rehabilitation remains to be seen. Nonetheless, based on the Debtor's stated intent and apparent ability to reorga-

nize should it regain its escrowed capital, I find that the Debtor has survived the objective futility test.

■■■■ The subjective bad faith standard is meant to insure that the Debtor actually intends to use chapter 11 to reorganize and rehabilitate itself and not simply to cause hardship or delay to its creditors by invoking the automatic stay. *Carolin,* 886 F.2d at 702. Case law in this Circuit is clear regarding this standard: one, the inquiry into the Debtor's intent (or lack of intent) is to be analyzed as of the time of the filing of the petition, and two, the frustration of creditor remedies alone is insufficient to establish an absence of intent to rehabilitate. *Cohoes,* 931 F.2d at 227; *Banque de Financement v. First Nat'l Bank,* 568 F.2d 911, 916 (2nd Cir.1977). Upon reflection, one appreciates the fact that filing for bankruptcy will always frustrate creditors because the Bankruptcy Code is designed to afford a debtor some breathing room by staying creditor's remedies against it. *In re Food Workshop, Inc.,* 70 B.R. 962 (Bankr.S.D.N.Y.1987). But there is a considerable gap between frustrating creditors and abusing the judicial purpose. *Cohoes,* 931 F.2d at 228.

Daiwa attempts to bridge this gap by asserting that, at the time of filing its petition, the Debtor improperly sought a litigation advantage and engaged in forum shopping by attempting to seek another bite at the apple in the federal arena through the vehicle of a fraudulent conveyance action. Daiwa's argument continues that such a motivation for filing bankruptcy shows the requisite lack of intent to reorganize or rehabilitate, and therefore, the Debtor's filing was in bad faith and susceptible to dismissal.

The short answer to this is that, Daiwa, not the Debtor, chose the first forum and even if the Debtor filed for chapter 11 relief to take advantage of certain provisions of the Bankruptcy Code, this, in and of itself, does not constitute bad faith. Further, the posture of the dispute between the Debtor and Daiwa can be distinguished from the cases cited by Daiwa. For one thing, there is no judgment imminent on the issues before the state court that will dispose of the lawsuit. Both parties acknowledge that the April 1,

1996 decision only cleared the way for discovery. For another, the Debtor did not file for bankruptcy to evade any court orders or agreements it had already made in state court. Currently, the res of the dispute, the original $32.5 million (which with accrued interest is now some $34 million), is sitting in escrow, pending the ultimate resolution of the lawsuit. Finally, the Debtor filed for bankruptcy more than six weeks after the April 1, 1996, decision denying its motion for summary judgment. This is consistent with Collis' contention that the Debtor was exploring available options, including bankruptcy. The Debtor's filing of a chapter 11 petition was not simply a knee-jerk reaction to an adverse state court decision, as is often the circumstance in the reported cases granting dismissal.

The Debtor relies on *9281 Shore Road Owners Corp. v. Seminole Realty Co. (In re 9281 Shore Road Owners Corp.),* 187 B.R. 837 (E.D.N.Y.1995), for the argument that pursuing a fraudulent conveyance claim is a legitimate purpose for filing a bankruptcy petition. In that case, the district court reversed the bankruptcy court's dismissal of the debtor's chapter 11 case because dismissal would deny the debtor an opportunity to pursue a fraudulent conveyance action. As the district judge noted, although the causes of action in §§ 273–276 of the N.Y. Debtor & Creditor Law are only available to unsecured creditors of the insolvent debtor, section 544 of the Bankruptcy Code allows a trustee (including a debtor-in-possession) to step into the shoes of such a creditor and pursue a fraudulent conveyance action in its bankruptcy case for the benefit of all creditors. *Id.,* at 851.

The Debtor is in a nearly identical situation. It emphasizes that to bring a fraudulent conveyance action on behalf of all its creditors, it must sue in this court. In response, Daiwa makes two points. First, it asserts that the Debtor has no creditors eligible to bring a fraudulent conveyance action because the unsecured creditors shown on the Debtor's petition and schedules either do not hold claims dating back to the date of the alleged fraudulent conveyance or are insiders. Second, it states that any benefit re-

ceived must go the estate's creditors. *See, 9281 Shore Road,* 187 B.R. at 851 (and cases cited therein).

Regarding the first point, the Debtor, in its responsive papers, in the adversary complaint and through Collis' testimony at the hearing, maintains that creditors do exist whose claims refer back to the conveyance date. In addition, no bar date has been set which would fully identify the universe of the Debtor's creditors. In any event, Daiwa is wrong; there appear to be two classes of creditors that may benefit from the proceeds of a successful fraudulent conveyance action, unpaid professionals and administrators and unpaid insider creditors. *See Moore v. Bay,* 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931).

Certain of the Debtor's professionals and administrators were owed money at the time of the transfer.[2] That they were subsequently paid for those particular services is of no consequence because they continued to provide services after the transfer for which they have still not been paid. It is not necessary "that the claim held by that creditor at the bankruptcy filing be identical to the one held at the time of the [fraudulent conveyance.]" *In re Healthco Int'l, Inc.,* 195 B.R. 971, 980 (Bankr.D.Mass.1996) (citing *SPC Plastics Corp. v. Griffith (In re Structurlite Plastics Corp.),* 193 B.R. 451, 458–59 (Bankr.D.Ohio 1995); *Official Unsecured Creditors' Committee v. Citicorp N. Am., Inc. (In re Aluminum Mills Corp.),* 132 B.R. 869 (Bankr.D.Ill.1991)).

 In addition, there may be allowable insider claims sufficient to confer standing, assuming, without deciding, that a debtor cannot maintain a fraudulent transfer action on a constructive fraud theory under either New York or federal law without creditors existing at the time of the transfer. It is true, as Daiwa states, that where avoidance would benefit only the equity, the debtor in possession lacks standing to maintain a fraudulent conveyance action. *Vintero Corp. v. Corporacion Venezolana De Fomento (In re Vintero Corp.),* 735 F.2d 740, 742 (2d Cir.1984); *Whiteford Plastics Co. v. Chase Nat'l Bank,* 179 F.2d 582, 584 (2d Cir.1950). However, where, as here, affiliated companies have provided services to the Debtor prior to the transfer for which they have still not been paid, they may provide the claims which Daiwa posits are necessary to support the complaint. Perhaps these claims are not bona fide or are subject to equitable subordination. However, the mere existence of an insider relationship is not a sufficient basis to warrant equitable subordination of their claims; an insider creditor must have actually used its power to its own advantage or to another creditor's detriment. *Braas Sys., Inc. v. WMR Partners (In re Octagon Roofing),* 157 B.R. 852, 857 (N.D.Ill.1993); *see also HBE Leasing Corp. v. Frank,* 48 F.3d 623, 634–35 (2d Cir.1995); *Goldstein v. Wolfson,* 132 F.2d 624, 626 (2d Cir.1943). And, in any event, even a subordinated claim may be sufficient grounding for a fraudulent transfer complaint; however, I need not and do not reach that issue.

Significantly, Daiwa is not seeking to dismiss the fraudulent transfer action. Were it moving to do so, I would be looking only to the sufficiency of the allegations of the complaint. I see no reason to impose a harsher

---

2. I make no finding as to whether their existence at the time of the transfer is a necessary factual predicate before the trustee may bring a fraudulent conveyance action under section 548(a)(2)(B)(ii) of the Bankruptcy Code. *Cf. Brandt v. Hicks, Muse & Co., Inc. (In re Healthco Int'l, Inc.),* 195 B.R. 971, 980 & n. 10 (Bankr. D.Mass.1996) finding even under section 544(b) that there is no requirement that a present creditor have been in existence at the time of the transfer because "future creditors have avoidance rights if a transaction leaves the debtor with unreasonably small capital" by the very terms of the Massachusetts' statute, *see also* N.Y. DCL § 274 ("Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors *and* as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent." (Emphasis added)). I note also that section 548 does not contain qualified language requiring that the transfer may only be avoided if there was at least one creditor in existence at the time of the alleged fraudulent conveyance in order for the trustee to avoid the transfer for the benefit of the estate, in contradistinction to what the Bankruptcy Act provided.

standard on the Debtor in this context. The Debtor has adequately pleaded the existence of an unsecured creditor with an allowable claim. Whether the proof will conform to the complaint is a matter for another day. The truth of the Debtor's allegations should not be decided in the context of a motion to dismiss the bankruptcy case simply because Daiwa claims that the fraudulent transfer action which is a predicate to reorganization is defective. The Debtor is entitled to its day in court.

■ Regarding the second point, while Daiwa is correct that an avoidance action can only be brought for the benefit of the Debtor's estate and creditors, the Debtor does have unsecured creditors who rendered prepetition services to it and thus can benefit if the Debtor should prevail.

Lurking in the shadows behind this motion is Daiwa's role in this affair, to which it gives scant acknowledgment. Under the terms of the Netting Agreement, a contract whose very validity has been brought into question, Daiwa pursued the equitable remedy of setoff by foreclosing on the Debtor's only assets, its cash and securities, and terminating its contract, thereby effectively shutting the Debtor down. Whether or not justified in its actions, Daiwa is the catalyst for the Debtor's current financial predicament.

I cannot allow Daiwa to come into this court to declare that because the Debtor has no business operations, as a result of Daiwa's unilateral action, the Debtor cannot avail itself of chapter 11 protection, especially where the Netting Agreement upon which Daiwa relied to engineer the setoff and terminate the Debtor's operations is very much at issue. In other words, I am in agreement with the judge in the State Court Action, who ordered the escrowing of the funds seized by Daiwa because he found that leeway must be given to the Debtor in light of the severe nature of Daiwa's action. *Daiwa America Corp. v. Rowayton Capital Mgmt., Inc.*, No. 118148/95, slip op. at 4–5 (N.Y.Sup.Ct., N.Y.County, Aug. 17, 1995).

For much the same reason that it is inappropriate to look beyond the face of the Debtor's complaint to assess now its sufficiency, Daiwa's assertion that the complaint will be subject to mandatory or permissive abstention under § 1334(c)(1) and (2) is premature and irrelevant to this motion. Daiwa may appropriately assert those challenges to the complaint in the adversary proceeding.

Finally, Daiwa contends that the Debtor cannot propose a plan of reorganization that will be confirmable. No plan has been put forth, but the initial exclusivity period provided by § 1121(d) has not yet expired. Given the early stages of this reorganization case, I believe that it is too early to make the determination which Daiwa requests. The Debtor has in escrow approximately $34 million and was not in precarious financial condition prior to Daiwa's setoff. The Debtor should be given the opportunity to propose a plan which can be scrutinized by the parties and this court. *In re Toyota of Yonkers, Inc.*, 135 B.R. 471 (Bankr.S.D.N.Y.1992) (citing to *Theatre Holding Corp. v. Mauro*, 681 F.2d 102, 106 (2d Cir.1982); *In re Hempstead Realty Assocs.*, 38 B.R. 287, 290 (Bankr. S.D.N.Y.1984)).

Based on the foregoing, I hold that Daiwa has failed to demonstrate that the Debtor did not file its chapter 11 petition in good faith; therefore, Daiwa's motion to dismiss the chapter 11 petition pursuant to § 1112(b) is denied.

### B. Dismissal or Suspension pursuant to § 305(a)

■ Section 305(a) permits a court to dismiss or abstain from hearing a bankruptcy case if to do so would better serve the interests of creditors and the debtor. Daiwa has not shown how any party in interest other than Daiwa would be benefitted by a dismissal. A motion under § 305(a) to dismiss a petition or suspend the bankruptcy case is a form of extraordinary relief. *In re 801 South Wells Street, L.P.*, 192 B.R. 718, 726 (Bankr.N.D.Ill.1996). As with § 1112, the court looks to the facts of the individual case for guidance. *Id.* at 723; *In re Fitzgerald Group*, 38 B.R. 16, 17 (Bankr.S.D.N.Y.1983). While no uniform test has emerged, courts have found a number of factors that aid in the analysis which are set out in the *801 South Wells* case. 192 B.R. at 723.

Of the seven factors cited by the *South Wells* court, Daiwa believes four are relevant to my analysis here: (i) economy and efficiency of administration; (ii) whether another forum is available to protect the interests of both parties or there is already pending a state court proceeding; (iii) whether federal proceedings are necessary for a just and equitable solution; and (iv) the purpose for which the bankruptcy has been sought. Of these factors, the first is a primary consideration. *In re Fitzgerald Group,* 38 B.R. at 18.

Regarding the first factor, if it were true that the only issue presented were the ownership of property requiring an interpretation solely of state law, then I might be more easily persuaded to let the State Court Action proceed on the grounds of being economical and efficient. However, the Debtor is seeking to avoid the Netting Agreement as a fraudulent transfer, relief not available outside this forum. Indeed one gets to the issue in the State Court Action, that is, whether Lipschutz had the authority to bind the Debtor to the Netting Agreement, only if the Netting Agreement survives attack as a fraudulent transfer. It would hardly be economic and efficient to proceed with trial of the subsidiary issue first, when that issue may never need to be reached. Furthermore, trial of the subsidiary issue is a long way off, because discovery has not been completed. Meanwhile, the $34 million continues to sit in an escrow account, available to neither side.

Considering the second factor, a suitable alternative forum will be deemed to exist if that forum has pending before it an action the resolution of which will equitably satisfy the creditors and will not be duly burdensome or prejudicial to the Debtor. *801 South Wells,* 192 B.R. at 724. Daiwa trumpets the efficacy of permitting the State Court Action to proceed to conclusion. I've just dealt with why that is not sensible. The Debtor will not get a second or third bite at the apple, as Daiwa suggests, by prosecuting the fraudulent conveyance action in this court because the issues involved regarding the Netting Agreement have not been addressed in the State Court Action. Further, in the cases cited by Daiwa, the disputes there implicated pure state law issues; there was no need for a bankruptcy court to exercise jurisdiction because there were no true federal claims.

As to the third factor, it is indisputable that for the Debtor to bring its fraudulent conveyance action, it must do so in this court. While Daiwa is correct that individual creditors of the Debtor could bring an action on their own at the state court level, any recovery would not be for the collective benefit of the creditors and would be limited to the amount of the plaintiff creditor's claim. Daiwa overlooks the fact that the Debtor is authorized under § 548 and § 544 to bring its own action on behalf of all its creditors in the bankruptcy court.

Regarding the final factor, the Debtor has asserted that it intends to file a plan of reorganization. It has discussed this intention with shareholder representatives. Nothing in the record suggests the futility of filing a plan. Nor has any testimony been adduced or evidence produced to controvert the Debtor's statement of its intention or otherwise to prove that it has filed for an improper purpose.

Daiwa proffers *In re Westerleigh Development Corp.,* 141 B.R. 38 (Bankr.S.D.N.Y. 1992) for the proposition that the Debtor's filing was improper because the Debtor is not conducting any business. However, in that case, the Debtor was defunct due to an internal dispute between its two shareholders that had spilled over into state court. While each sued the other, one of the shareholders, using his wholly-owned corporation as a petitioning creditor, filed an involuntary chapter 11 against the debtor. The bankruptcy court dismissed the proceeding, holding that using the Bankruptcy Code as a weapon to get more leverage in an internal two-party dispute was impermissible. Here, no such dispute or infighting led to the Debtor's current financial distress. For much the same reasoning as in the above discussion regarding § 1112(b), I do not find that the Debtor's petition should be dismissed under § 305.

Accordingly, Daiwa's motion to either dismiss or suspend the Debtor's chapter 11 case pursuant to § 305(a) is denied.

### C. Relief from the Automatic Stay pursuant to § 362(d)(1)

 As an alternative form of relief, Daiwa seeks to lift the automatic stay for cause pursuant to § 362(d)(1) to allow the State Court Action to proceed. Whereas Daiwa has the initial burden of production of evidence that "cause" exists, 11 U.S.C. § 362(d)(1), the Debtor has the burden of proof that stay relief is not warranted. 11 U.S.C. § 362(g)(2).

"Cause" is not defined in either the statute or the legislative history. *Burger Boys, Inc. v. South St. Seaport L.P. (In re Burger Boys, Inc.)*, 183 B.R. 682, 687 (S.D.N.Y.1994). However, the legislative history does provide that "a desire to permit an action to proceed to completion in another tribunal may provide ... cause." *In re Laventhol & Horwath*, 139 B.R. 109, 116 (S.D.N.Y.1992) (citing H.R.Rep. No. 595, 95th Cong., 2d Sess. 343–44 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 6300).

 The Second Circuit has instructed bankruptcy courts to look to a series of twelve factors to determine whether a creditor should be permitted to proceed with litigation in a non-bankruptcy forum. *Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1286 (2d Cir.1990). A court should apply these factors on a case-by-case basis and use only the factors that are deemed relevant, assigning to each factor whatever weight the court feels is appropriate. *In re Touloumis*, 170 B.R. 825, 828 (Bankr.S.D.N.Y.1994); *Burger Boys*, 183 B.R. at 688; *Sonnax Indus.*, 907 F.2d at 1286. Six of the twelve *Sonnax* factors are relevant here. I will address each below.

Factor (i)—whether lifting the stay would result in a partial or complete resolution of the issue. If I were to grant Daiwa's motion, it would not partially or completely resolve the issues between the parties because the Debtor will be pursuing its fraudulent conveyance action even if Daiwa were to prevail regarding the enforceability of the Debtor's guarantee.

Factor (ii)—whether such litigation would be in the interest of judicial economy and would lead to its expeditious and economical resolution. The necessity of simultaneously conducting two proceedings in two different courts regarding the enforceability of the Netting Agreement would be neither expeditious nor economical.

Factor (iii)—whether litigating the State Court Action would prejudice the interests of other creditors. While the Debtor does have few creditors, their interests plainly would be prejudiced if the Debtor were unable to bring its fraudulent conveyance action in the bankruptcy proceeding.

Factor (iv)—whether the State Court Action lacks any connection to, or would interfere with, the bankruptcy proceeding. Maintenance of the State Court Action would interfere with the bankruptcy proceeding because the facts underlying the State Court Action are identical to those that would be contained in the fraudulent conveyance proceeding. Permitting two actions to proceed based on the same operative facts would not be in the interest of judicial economy, particularly where, as here, the Debtor has no revenue stream.

Factor (v)—whether the parties are ready for trial. The State Court Action is still in its infancy. While Daiwa makes much of the fact that the lawsuit has been pending for 10 months prior to the filing date, over five of those months, October 16, 1995 through April 1, 1996, were spent waiting for the state court judge's decision regarding the motion for summary judgment. Both parties concede that further discovery will be necessary to get to the heart of the state court dispute, whether Lipschutz had the appropriate authority to bind the Debtor under the terms of the Netting Agreement by which Daiwa received its power to setoff.

Finally, factor (vi) requires me to weigh the harm to Daiwa in maintaining the stay against the prejudice to the Debtor if I lift it to permit the State Court Action to proceed. If I lift the stay, then the Debtor must battle for its right to the frozen funds without the benefit of the avoidance powers of § 544 and § 548. Daiwa asked the state court to declare that its setoff was permissible. It will effectively have that request considered, al-

beit in this court and with a newly-available theory being espoused. The funds in question are currently in escrow and are not available to the Debtor or its shareholders to be redeemed as Daiwa might fear. This softens substantially the harm to Daiwa. And in any event, it is indisputable that until the issues surrounding the validity and/or voidability of the Netting Agreement are finally adjudicated, Daiwa itself will have no access to the funds in escrow.

Although Daiwa maintains that "protracted" litigation has occurred, in fact, the dispute has been truly litigated for less than 5 months. While in terms of volume, an ample amount of discovery has occurred, it is not so vast to provide this court with a burdensome learning curve. (Indeed I've traveled a large part of that route already through the manner in which Daiwa tried this contested matter.) More discovery has to occur anyway now that the state court narrowed the focus to whether Lipschutz had authority, apparent or actual, to bind the Debtor to the Netting Agreement. Accordingly, I am not denying Daiwa the benefit of an immediate trial by declining to lift the stay. Again, the cases on which Daiwa relies are easily distinguishable. For example, in *In re Salisbury,* 123 B.R. 913 (S.D.Ala.1990), the court lifted the automatic stay to permit a creditor to continue prosecution of his counterclaims in a lawsuit which the debtor had commenced prepetition in state court and later attempted to remove to the bankruptcy court to avoid posting a bond and appearing for a contempt proceeding. Those facts bear no resemblance to these. In the end, I find that the harm to Daiwa is outweighed by the prejudice to the Debtor if it cannot avail itself of a cause of action which the Bankruptcy Code provides.

In weighing all of the above factors, I decline to lift the automatic stay.

### Conclusion

Based on the above, Daiwa's motion to dismiss the Debtor's chapter 11 petition pursuant to § 1112(b) is denied; Daiwa's motion to dismiss or suspend the Debtor's chapter 11 case is denied; and Daiwa's motion to lift the automatic stay for purpose of proceeding

with the State Court Action is denied. SETTLE ORDER consistent with this decision.