In re Michael Quintin **HEAD** and Sandra Head Garnet Neil Webster Rudy Darius Chariandini Thomas Stinson Medland Joseph Ross Lowrie Robert James Tweedy Murray Hogarth, Debtors.

Bankruptcy Nos. 98–10778 K, 98–10787 K, 98–10789 K, 98–10791 K, 98–10792 K, 98–10793 K, and 98–10794 K.

United States Bankruptcy Court, W.D. New York.

July 17, 1998.

---

Andrew Grossman, New York City, for Debtors.

Robert E. Gerber, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Society of Lloyd's.

### MEMORANDUM OF DECISION AND FINAL ORDER OF DISMISSAL

MICHAEL J. KAPLAN, Chief Judge.

These cases are seven of what are said to be dozens of United States Bankruptcy cases commenced around the nation by non-United States citizens seeking a less hostile forum for their disputes with Lloyd's of London ("Lloyd's") than they perceive the Courts of England to be. In so doing, these Debtors hope to avoid the consequences of the choice-of-law and forum selection clauses of certain contracts which they entered into or acknowledged relating to Lloyd's, which clauses require that the disputes be heard in England.

After a hearing upon Lloyd's' motions to dismiss, this writer announced from the Bench in open court that these Chapter 11 and 13 cases will be dismissed, some for lack of "eligibility" to be debtors under 11 U.S.C. § 109, and also because "cause" exists for all of the cases to be dismissed under 11 U.S.C.

§§ 1112 and 1307. It was also announced that for purposes of review, if any, this Memorandum of Decision would follow because today's rulings resolve questions that appear to be without precedent.

## DISCUSSION

The Second Circuit Court of Appeals has described Lloyd's as a "market somewhat analogous to the New York Stock Exchange...," and has observed that "[t]here are over 300 syndicates competing within Lloyd's for [insurance] underwriting business, each managed by an entity called a Managing Agent. Each Managing Agent is responsible for its own syndicate's financial well-being; it tries to attract capital and underwriting business." *Roby et al. v. Corporation of Lloyd's*, 996 F.2d 1353, 1357 (2d Cir.1993).

Capital is provided by individuals called "Names," who "bear unlimited liability for their proportionate losses in each syndicate they join. Their liability is several, not joint...." *Roby*, 996 F.2d at 1357.

Names are required to enter directly into two agreements and indirectly into two others. The "General Undertaking" is between a name and the Lloyd's' governing bodies and contains choice of forum (England) and choice of law (English) clauses. This undertaking does not contain an arbitration clause. The "Members' Agent's Agreement" is between a Name and his Members' Agent and also contains choice of forum (England), arbitration and choice of law (English) clauses.... [The latter agreement] specifically authorize[s] the Members' Agents to enter into a third agreement on behalf of the Names.... This agreement, not signed by the Names themselves, and apparently often not even signed by the Managing Agents, defines the rights and obligations of the Managing Agent of a syndicate and that syndicate's Names, and also contains choice of forum (England), arbitration and choice of law (English) clauses.... [It also permits] the Managing Agents to enter, on behalf of ... the Names ..., into [another agreement] which requires disputes related to the affairs of the particular syndicate to be arbitrated in London.

*Roby*, 996 F.2d at 1357–58.

The Second Circuit in *Roby, as well as* six other circuits,[1] have addressed the issue of whether United States citizens who are Names may avail themselves of a United States forum, and of the protections afforded by substantive law regulating securities in the United States. They have uniformly rejected the effort and have upheld the choice-of-law and forum selection clauses.

Those were not bankruptcy cases, however. In one bankruptcy case in which a Name filed for relief under Chapter 7, the bankruptcy court held that the presumption in favor of enforcement of such forum selection clauses in international transactions was overcome where enforcement of that clause "will result in a denial of the benefits and protections accorded by the Bankruptcy Code to debtors, creditors, and the bankruptcy estate." *In re Brown*, 219 B.R. 725, 730 (Bankr.S.D.Tex.1997). This Court need not decide today whether it would agree or disagree with that decision because the present cases are dramatically distinct from the case presented to that court. The present cases are Chapter 11 and 13 cases (not Chapter 7[2]) and were filed by Debtors who are domiciliaries of Canada, not the U.S. With one exception, they premise their eligibility to be debtors here solely upon arguments that this

---

1. *See Richards v. Lloyd's of London*, 135 F.3d 1289 (9th Cir.1998); *Haynsworth v. The Corporation*, 121 F.3d 956 (5th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1513, 140 L.Ed.2d 666 (1998); *Allen v. Lloyd's of London*, 94 F.3d 923 (4th Cir.1996); *Shell v. R.W. Sturge, Ltd.*, 55 F.3d 1227 (6th Cir.1995); *Bonny v. Society of Lloyd's*, 3 F.3d 156 (7th Cir.1993), *cert. denied*, 510 U.S. 1113, 114 S.Ct. 1057, 127 L.Ed.2d 378 (1994); *Riley v. Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953 (10th Cir.), *cert. denied*, 506 U.S. 1021, 113 S.Ct. 658, 121 L.Ed.2d 584 (1992).

2. This writer would likely agree that where a U.S. resident submits all non-exempt assets to a Chapter 7 Trustee for liquidation and "walks away" to start afresh, the estate ought not be made to bear the expense of liquidating Lloyd's' allowable claim in England.

Court finds too tenuous to satisfy the requirements of 11 U.S.C. § 109.[3]

Counsel for the Debtors called attention to the international character of these cases even before he filed them. He did so in the course of seeking guidance from the Clerk's office regarding local procedures, practices and customs. Consequently, when the cases were filed they were brought directly to the attention of this writer, as Chief Judge. It was immediately evident that the "residence" addresses provided for some of the Debtors could not possibly be permanent residences, and it was evident from certain of the schedules and statements that the Debtors lived, worked, and in most instances, owned substantial·assets in Canada, though the schedules seemed conspicuously incomplete.

Under 11 U.S.C. § 105(d), the Court issued a *sua sponte* "Order to Show Cause" directing the Debtors and counsel to appear before the Court for the purpose of addressing these apparent deficiencies and for the issuance of further appropriate orders. In the course of that appearance and other appearances before the Court, and in connection with the amendments filed to complete the schedules and to provide appropriate residence addresses for the Debtors ·(all of which residences are in Canada), counsel for the Debtors set forth the Debtors' strategy and the arguments thought to support it. In brief, each of these Debtors is a Name and each has been informed of substantial liabilities to Lloyd's based on a series of unusual insurance losses. Styling themselves as "investors," and considering English law to be too expensive and onerous as a forum in which to air their grievances against the way in which their participation in insurance underwriting at Lloyd's had been solicited, they sought to have Canadian courts apply the securities fraud law of Canada to their disputes. Those efforts did not show prospects of success, and United States citizens similarly situated were not having success in their efforts to have the courts of the United States apply U.S. securities fraud law either. *See Roby, supra.*

But it seemed to the Debtors that the U.S. laws of *bankruptcy* might be of assistance if they could invoke them. Bankruptcy would force Lloyd's into either filing proofs of claim, whereupon the Debtors could perhaps raise all of their fraud defenses, etc., as claims objections under 11 U.S.C. § 502, or it would force Lloyd's to ignore the bankruptcy filings and risk the possibility that ·a subsequent bankruptcy discharge might have extraterritorial effect to protect the Debtors' assets in Canada or elsewhere.

The Debtors established a facade of eligibility by obtaining U.S. mailing addresses and opening small bank accounts in U.S. banks, but they have recently abandoned any argument that these efforts to manufacture eligibility should be given any force or effect. Rather, their principal arguments regarding eligibility under 11 U.S.C. § 109 are that: (1) the Debtors and Lloyd's had all done extensive business in the United States and "doing business in" the United States should be found to be the equivalent of having "property" in the United States for purposes of 11 U.S.C. § 109; (2) they had a certain interest ·in a very large sum of money held in trust in the United States for the benefit of entities in the United States who were insured by Lloyd's and who might suffer losses that Lloyd's must cover; and (3) they may have direct liability to U.S. insureds, and, consequently, substantial "debts" in the U.S.

█ This Court rejects those arguments and finds that these Debtors are not eligible to be debtors under the Bankruptcy Code, as "eligibility" is defined by 11 U.S.C. § 109 and interpreted by this Court's decision in the case of *In re McTague,* 198 B.R. 428 (Bankr. W.D.N.Y.1996). The Court finds that to equate having "property" in the United States with "doing business" in the United States would be to give effect to the Debtors' wishful thinking rather than to properly interpret the statute. It cannot be questioned that Congress is thoroughly familiar with both terms of art, and·that it selected one rather than the other. The statute is plain and unambiguous. No amount of doing busi-

---

**3.** The exception is the estate in one case which includes ownership of a vacation condominium in this District. This will be discussed later.

First, the eligibility of the other Debtors will be considered.

ness in the United States will, of itself, provide a basis for eligibility under § 109. The Court knows of no decision under the Bankruptcy Reform Act of 1978 either in support or derogation of this holding.

■ As to the second argument, this Court suggested in *McTague, supra,* that there is a difference between having property in the United States and having some type of remote or inchoate claim against property that is in the United States. The Court rhetorically asked whether leasing a U.S. post office box or obtaining a U.S. phone number would constitute having property in the United States. The Court in that case found that having a bank account in the United States did constitute having property in the United States and found the Debtor to be eligible to be a debtor on that basis, but hinted that the result might be different if the bank account had been opened here to manufacture eligibility.[4]

There appears to be no dispute about the fact that the trust fund located in the United States exists for the benefit of U.S. insureds, and not for the benefit of Names. Also, it is only theoretically possible (by no means a legal certainty) that if Names could prove that if there is a surplus in the trust fund, then Lloyd's could be compelled, in some fashion, to distribute that surplus to Names. That theory, together with the fact that the funds are in the United States, does not mean that Canadian Names have "property" in the United States, in this Court's view. Whatever interest Names might have in the fund is too tenuous, too inchoate, and too contrived. Moreover, in this Court's view, whatever "claim" to the funds that theory might support is not a claim of "ownership,"

and consequently the claim is *located* wherever the Names reside, not where the trust fund resides, even if the claims may only be *asserted* in the place where the trust fund resides. The Court has not sought authorities regarding this point, as it seems to be self-evident.

■ The third argument falls because of the same reasoning that belies the first and second. U.S. liabilities may certainly arise from doing business here. But the obligation to pay exists wherever the obligor is located. The fact that the obligee is in the U.S. does not equate to having property in the U.S.

In sum, then, those Debtors before the Court who base their eligibility only on the three arguments recited above are not eligible under § 109. (To make the record clear, if these Debtors were to continue to assert eligibility by virtue of having acquired U.S. mailing addresses and opening small bank accounts in the U.S., then this Court would directly hold that one cannot so manufacture eligibility, as was suggested in *McTague, supra.*)

■ As an alternative basis for the dismissal of these cases, and also as the basis for dismissal of the case of the Debtors whose estate includes a vacation condominium in the United States, the Court finds that the cases should be dismissed for "cause."[5]

This Court has uniformly held that any debtor (regardless of nationality) who files for relief under a rehabilitative chapter of the Bankruptcy Code must proceed in good faith, which is to say must treat his or her creditors in a "fundamentally fair" manner.[6] This writer has not published to that effect, but on

---

**4.** Ultimately, Ms. McTague's case was dismissed for "cause" under 11 U.S.C. § 707(a).

**5.** At an early stage of this case, when the Debtors were insisting that the normal time limits for the filing of proofs of claims, etc., run their normal course, the Court *sua sponte* insisted that it would not compel creditors to "jump through Debtors' hoops" before the Debtors satisfied the Court of a means to place all of their Canadian assets within the jurisdiction of this Court, as if those assets were located in the United States. This writer thought it imperative that the Debtors not obtain advantages as against their creditors, while their creditors could not have the advan-

tage of having equal to the value of the Debtors' Canadian holdings. As of the date of the hearing on the present motions to dismiss, the Debtors had sent notice to creditors of the proffers in that regard. To the extent, if any, that these postpetition efforts demanded by the Court might be viewed to have "cured" the Debtors' initial lack of eligibility, this alternative holding should be viewed as the primary holding.

**6.** *See, e.g., In re Love,* 957 F.2d 1350, 1357 (7th Cir.1992) ("[T]he focus of the [good faith] inquiry is fundamental fairness..."); *In re Setzer,* 47 B.R. 340 (Bankr.E.D.N.Y.1985).

an almost daily basis applies that precept. It is an extremely common occurrence that a debtor in Chapter 11, 12 or 13, wishes to move a vitriolic matrimonial proceeding, mortgage foreclosure, or tort suit into the bankruptcy forum, and then attempt to utilize the bankruptcy forum as a sword—a new weapon in the arsenal of vitriol. Without exception, this Court does not permit such a litigation tactic. The rehabilitative chapters of the Code provide a means for a debtor to address his or her obligations with honesty of intention, by paying them in whole or in part. Those chapters are not a means to unfairly deflect accountability. If a debtor is not going to cease the contest and attempt to satisfy the obligation in whole or in part, then that debtor must provide a fair means to assure that the opponent will not be prejudiced if, after the contest has continued to a conclusion, it turns out to be the opponent who prevails rather than the debtor.

To be exact, this Court is not finding that the petitions were filed in "bad faith" nor is it holding that these Debtors could never propose "good faith" Chapter 11 or 13 plans. This holding is that a failure to proceed after filing in a fundamentally fair manner, with honesty of intention, and with the same type of reasonably founded proposals that Rule 11 requires of all documents that are filed with the court, constitutes a non-enumerated "cause" for dismissal under 11 U.S.C. §§ 1112 and 1307.

Seven United States Courts of Appeals have told hundreds of United States citizens who are Names that they must go to England to deal with their disputes with Lloyd's,[7] as they initially had agreed to do. But the non-United States citizens here wish to accomplish (by claiming entitlement to relief under the U.S. Bankruptcy Code) what United States citizens who have not sought such relief have been told they cannot accomplish.

In essence, they have sought to use the bankruptcy courts of the United States as a "flag of convenience" by which they endeavor to hammer Lloyd's into submission. In their initial effort, they sought to do so for little more than the cost of the filing fee. (Somewhat more was at issue as to the Debtors who owned the vacation condominium in the United States.) It was the Court that *sua sponte* refused to let the time bars of the Bankruptcy Code and Rules hang as a Sword of Damocles above Lloyd's or other creditors, and instead compelled the Debtors first to find a way to place all of their Canadian assets (or the value thereof) within the summary jurisdiction of this Court. This was not offered voluntarily by the Debtors as a matter of fundamental fairness.

Furthermore, even until oral argument on these motions to dismiss, the Debtors insisted, without equivocation, that "choice-of-forum clauses have no relevance in bankruptcy." It was only when the Court, at oral argument, pointed out that that statement is patently untrue—that it is well within the discretion of the Bankruptcy Court to enforce a choice-of-forum clause in appropriate circumstances—that the Debtors, through counsel, acknowledged same.

### CONCLUSION

At each step along the way, the Court has had to compel the Debtors to act fairly. To reiterate, the Court had to direct the Debtors to amend their petitions to reflect proper residence addresses, to make full disclosure on their schedules and statements, and to proffer a way of submitting their assets (nearly all of which are outside the territorial jurisdiction of this Court) to the Court's summary jurisdiction. Their misrepresentation of existing law regarding the relevance of choice-of-forum clauses in bankruptcy proceedings had to be flatly overruled by the Court at argument on the present motion.

The Court finds that at no point in these proceedings have these Debtors sought to treat Lloyd's (which is their principal non-insider unsecured creditor) in a fundamentally fair manner. Rather, they have sought to extract every possible benefit from the proceedings, and have offered nothing at all voluntarily. Their espoused purpose has been to obtain an advantage in their battle with Lloyd's, which advantage has been decisively denied by higher authority to persons

---

**7.** *See supra* note 1.

who are U.S. citizens, but who are not debtors under the Bankruptcy Code.

Whether this Court would agree with the bankruptcy court in the *Brown* case, *supra*, in a Chapter 11, 12 or 13 case involving U.S. citizens (*Brown* was a Chapter 7 case), will depend, at least in part, upon the extent to which those debtors do or do not exhibit the pattern, exhibited in these cases, toward pedantic arguments designed to extract every possible benefit, and to give up nothing until the Court insists upon it.

The lack of fundamental fairness manifested at every stage of these cases to date constitutes an unenumerated "cause" for dismissal of these cases,[8] and dismissal is so ordered.[9]

Further, all adversary proceedings pending in this case are dismissed as now lacking a jurisdictional predicate.

SO ORDERED.

**8.** Under the rules of construction found in 11 U.S.C. § 102(3), the term "including" in §§ 1307 and 1112 is not a limiting term.

**9.** Lest these Debtors or others interpret the various teachings of this decision as a "primer" as to how non-United States domiciliaries might obtain relief in the United States from their choice-of-law and choice-of-forum agreements, it must be emphasized that nothing stated in this decision would preclude a decision by a bankruptcy court to enforce such clauses and abstain from jurisdiction in favor of another forum, just as the bankruptcy court did as to a preference cause of action in the case of *In re Maxwell Communication*, 93 F.3d 1036 (2d Cir.1996), and just as the bankruptcy court did as to a dischargeability trial where the debtor had previously selected a state forum for the adjudication of that liability, in the case of *In re Salisbury*, 123 B.R. 913 (S.D.Ala. 1990).