In re PAPER I PARTNERS, L.P.,
Involuntary Debtor.

In re Papier II Partners, L.P.,
Involuntary Debtor.

Nos. 01–42745 (REG), 01–42746(REG).

United States Bankruptcy Court,
S.D. New York.

Sept. 3, 2002.

Stewart Occhipinti & Makow, LLP, By Tracy E. Makow, Esq., New York City, Angel & Frankel, P.C., By Joshua J. Angel, Esq., New York City, for Alleged Debtors.

Torys, LLP, By Emanuel C. Grillo, Esq., New York City, Salans Hertzfeld Heilbronn Christy & Viener, LLP, By John D. Viener, Esq. and Jonathan G. Kortmansky, Esq., New York City, for Petitioning Creditors.

*FINDINGS OF FACT AND CONCLU-SIONS OF LAW WITH RESPECT TO ORDER FOR RELIEF*

ROBERT E. GERBER, Bankruptcy Judge.

These involuntary cases under chapter 7 of the Bankruptcy Code were commenced by creditors ("the Petitioning Creditors")—all former limited partners—of Paper I Partners, L.P. and Papier II Partners, L.P. ("Paper I" and "Papier II," and collectively, the "Partnerships" or the "Alleged Debtors"), partnerships formed to effect a tender offer for the shares of a Swiss company. After a filing against Paper I initiated by 3 original Petitioning Creditors, they were joined by 25 others;[1] a single petitioning creditor—Lakeshore International, Ltd. ("Lakeshore")—filed against Papier II. Failures to pay the former limited partners amounts due to them triggered the filings.

In significant respects, the matter before the Court raises the issues that traditionally are considered in connection with the trial of any involuntary petition. In other respects, by reason principally of the international nature of the two Partnerships' business, Papier II's organization offshore, and the unique way by which the Partnerships purported to satisfy their ob-

ligations, there are issues warranting special discussion. The dialogue has been clouded by the respective parties' personal accusations toward the other, and contentions as to what might be best for the continued success of the partnership—i.e., for its remaining general and limited partners, who are holders of equity, whose interests, under law, are subordinate to those of creditors. Ultimately, however, the matter raises straightforward issues of application of the facts to the requirements of the Code—and in particular, sections 109, 303, and 305.

Of these, the most significant are:

(1) Whether the Alleged Debtors (and particularly Papier II) are eligible debtors under section 109;

(2) Whether the Petitioning Creditors hold non-contingent bona fide claims against the Alleged Debtors, as required under section 303(b);

(3) Whether the Alleged Debtors are generally not paying their debts as such debts become due, as required under section 303(h);

(4) Whether abstention by the Court is appropriate under section 305; and

(5) Whether the petitions were filed in bad faith.

For the reasons set forth below, the Court finds that (1) each of the Partnerships is eligible to be a debtor under the Code; (2) the debts owed to the Petitioning Creditors are non-contingent and bona fide; (3) the Alleged Debtors were generally not paying their debts as such became due; (4) abstention is unnecessary and inappropriate; and (5) the petitions were not filed in bad faith.[2] Accordingly, orders

---

1. Docket # 4.

2. The Alleged Debtors moved to dismiss the petitions in each of the two cases shortly after

for relief will be entered in each case. The following represents the Court's Findings of Fact and Conclusions of Law in connection with its determination.

*Facts*

## I. Background

### A. The Partnerships

Paper I is a limited partnership organized under the laws of the State of Delaware. It was formed pursuant to an Agreement of Limited Partnership dated July 6, 1998 (the "Paper I Agreement"), among Asher B. Edelman & Associates LLC ("Edelman LLC"), as general partner, and various limited partners. The Paper I Agreement listed Luxembourg as the principal place of business for the partnership, and designated a registered office and agent in Delaware; however, as set forth more fully below, the business of Paper I was conducted in significant part out of the offices of its general partner, Edelman LLC, at 717 Fifth Avenue, 15th Floor, in New York City. Paper I's Petitioning Creditors are 28 former limited partners of Paper I.[3]

Papier II is also a limited partnership, but, unlike Paper I, was organized offshore; it was organized under the laws of Turks and Caicos Islands, B.W.I. ("Turks and Caicos"). Papier II was formed pursuant to an Agreement of Limited Partnership dated July 8, 1998 (the "Papier II Agreement"), once more among Edelman LLC, as general partner, and various limited partners. The Papier II Agreement listed Luxembourg as its principal place of business, and designated a registered office and agent in Turks and Caicos. Once more, however, the business of Papier II was conducted in significant part out of the offices of Edelman LLC in New York City. Papier II has a single petitioning creditor—Lakeshore, a former limited partner.[4]

### B. The Alleged Debtors' General Partner

Edelman LLC consists of five members, Asher B. Edelman, Irving Garfinkel, Gerry Agranoff, Sebastiano Andina, and Stephen McAllister. Mr. Edelman holds the controlling interest in Edelman LLC, and took the most significant actions on behalf of the Partnerships with respect to the matters relevant to these cases. Edelman LLC correspondence to the Petitioning Creditors,[5] and an affidavit executed by Mr. Edelman,[6] made reference to actions taken on behalf of the Partnership by the "Edelman Group," which included the two Alleged Debtors and other entities.

### C. The Partnerships

Each of Paper I and Papier II was formed for the purpose of acquiring publicly traded shares of Baumgartner Papier Holding SA ("Baumgartner"), a paper wholesaler, manufacturer of cigarette fil-

---

the cases' filing (Docket # 11), but the Court determined, prior to the commencement of the trial of the petitions, that the dismissal motions raised disputed issues of fact, and that the consideration of the motions should be merged with that of the underlying petitions. (See Transcript of Trial of June 18, 2002 ("Tr.") at 4). After the Alleged Debtors argued their dismissal motions at the conclusion of the Petitioning Creditors' case, the motions were denied. As the discussion on the merits necessarily is determinative of the motions, the motions will not be addressed separately here.

**3.** Pretrial Order in Paper I, Docket # 24 ("Paper I PTO") at 4.

**4.** Pretrial Order in Papier II, Docket # 24 ("Papier II PTO") at 4. There was no contention that Papier II had 12 or more holders of claims, requiring more than a single petitioning creditor.

**5.** Exhs. P–3 at PP00261, P–4 at PP00279.

**6.** Exh. P–35 ¶ 16.

ters, and paper converter in Switzerland. Baumgartner is a corporation organized under the laws of Switzerland. Each of the Paper I and Papier II Agreements of Limited Partnership (collectively, the "Partnership Agreements") provided in its Section II, in relevant part:

> The purposes of the Partnership are to acquire, on margin or otherwise, and by open market purchase, privately negotiated purchase or otherwise, securities of every nature and description (including options) of a specific entity, the name and business of which each Limited Partner acknowledges he is familiar. . . .

The "specific entity" referred to in the quoted paragraph was Baumgartner. The shares of Baumgartner held by the Alleged Debtors (the "Baumgartner Shares") constitute by far the most material assets of both Paper I and Papier II, although each has other assets, such as books and records. The Baumgartner Shares were pledged by the Alleged Debtors to Credit Agricole Indosuez (Suisse) SA ("Credit Agricole"), a bank in Switzerland, as security for margin loans from Credit Agricole under loan agreements entered into in July 1998.[7]

## II. The Relevant Events

### A. The Tender Offer

On June 7, 2001, the Edelman Group announced its intention to launch a tender offer for Baumgartner.[8] The Edelman Group made a pre-announcement of its intention on that day, which was required under Swiss law, or at least understood by Mr. Edelman to be such.[9] The Pre-Announcement stated, among other things, that the offer was expected to be published by July 18, 2001.[10] A press release was also issued on June 7, which stated, among other things, that the tender offer would be made through Multipapiers SA, Pully ("Multipapiers"), a private Swiss holding company, of which Malmenayde SA ("Malmenayde"), a French paper merchant, was the controlling shareholder. Other stakes in Multipapiers were held by the Edelman Group and Hansa AG, a Swiss investment company.[11]

A partnership agreement, dated as of June 6, 2001, was entered into with respect to Multipapiers, among Malmenayde; Hansa AG; and Asher B. Edelman & Associates LLC, USA, "c/o Edelman Group—717 5th Avenue, New York, N.Y. 10022—USA," referred to in that agreement as "Edelman."[12] That agreement provided the Edelman Group with a 37.5% interest in Multipapiers, and stated that the Edelman Group would provide its share of funding for Multipapiers by delivering CHF 36,375,000 in Baumgartner Shares, which would be pledged as security for a credit facility for the tender offer.[13] At least many of these Baumgartner Shares would be the shares owned by the Alleged Debtors.

On June 18, 2001, three signatories on behalf of Edelman LLC (Messrs. Edelman, Agranoff, and McAllister) wrote at least some of the limited partners of the

---

7. Paper I PTO at 4, Papier II PTO at 4.

8. Exh. P–3 at PP00261.

9. Upon the objection of the Petitioning Creditors, the Court accepted Mr. Edelman's statements as to the requirements of Swiss law not as proof of Swiss law, but for the limited purpose of setting forth his understanding of it, and as to why he did what he did.

10. Exh. P–3 at PP00262.

11. *Id.* at PP00265.

12. Exh. P–27

13. Exh. P–27.

Partnerships, advising of the announcement of the tender offer.[14] They announced the need to extend the term of the Partnerships (which otherwise would terminate on July 31, 2001),[15] and sought limited partner approval of the extension.

### B. The Withdrawal of the Petitioning Creditors from Paper I and Papier II

On June 28, 2001, by fax to Mr. Edelman in New York,[16] John Viener, a representative of several limited partners of Paper I, wrote Mr. Edelman, advising that the limited partners that Mr. Viener represented were not able to extend the partnership another year, and that if the partnership was going to be extended, they would have to withdraw. Mr. Edelman responded the following day, by fax sent from the New York office of "The Edelman Companies," expressing his understanding of Mr. Viener's position, and stating "[w]e will try to construct your exit in a way that fits your requests." [17]

On July 16, 2001, Mr. Viener wrote Mr. Edelman again, addressing his letter to Mr. Edelman at a variety of locations, formally expressing the unwillingness of 27 limited partners of Paper I and 3 limited partners of Papier II to extend the life of the partnerships.[18]

On July 19, 2001, in letters faxed from the New York office of "The Edelman Companies," Mr. Edelman wrote to each of the Petitioning Creditors.[19] Each of those letters stated, in relevant part:

You are hereby notified that the General Partner of the Partnership has elected, pursuant to Section 7.2(a) of the Agreement of Limited Partnership to require you to withdraw as a limited partner of the Partnership, effective July 30, 2001 (the "Withdrawal Date").

You will receive the value of your interest in the Partnership as of the Withdrawal Date within thirty (30) days thereafter in accordance with Section 7.2(b), as the Partnership will be continued, after your withdrawal and that of certain other limited partners, by the General Partner and the remaining limited partners.

Section 7.2(a) of each of the two Partnership Agreements—the first of the two provisions to which Mr. Edelman referred—provided, in relevant part, that "[t]he General Partner, in his sole and absolute discretion, with or without cause, may require any Limited Partner to withdraw from the Partnership upon written notice to that effect to such Limited Partner. . . ." Section 7.2(b) of each of the two Partnership Agreements—the second of the two provisions to which Mr. Edelman referred—provided, insofar as relevant here:

If the Partnership is continued after the Withdrawal Date, such Limited Partner shall be entitled to receive within 30 days thereafter, in accordance with this Section 7.2, the value of such Limited

---

14. Exh. P–4.

15. Each of Partnership Agreements had provisions with respect to its termination. Section 8.1 of each of the Partnership Agreements, a section under the heading "Dissolution and Termination," provided, in relevant part:

> The Partnership shall be dissolved and its business wound up upon the earliest to occur of . . . July 31, 2000, unless extended by the General Partner, in his discretion, to July 31, 2001.
> Exh. P–1 at 9; Exh. P–2 at 12.

16. Exh. P–5.

17. Exh. P–6.

18. Exh. P–7.

19. Exh. P–9.

Partner's interest in the Partnership as of the applicable Withdrawal Date.... Exh. P–1 at 8; Exh. P–2 at 11.

Another paragraph, to which Mr. Edelman did not expressly refer, discussed the computation of the amount to be paid, and the currency with which it could be paid. Section 7.2(c) of each of the two Partnership Agreements provided:

The value of a withdrawing Limited Partner's interest in the Partnership shall be that amount that the Limited Partner would have received had the Partnership been dissolved as of the Withdrawal Date, its debts and liabilities paid or provided for and its assets distributed in the order of priority set forth in Section 8.3. *Such value shall be determined in the manner of Section 10.4. The value of such withdrawing Limited Partner's interest may be paid in cash, securities valued (pursuant to Section 10.4) as of the date of payment, or any combination thereof,* in the sole discretion of the General Partner.

*Id.* (emphasis added). Section 10.4, to which reference was made in Section 7.2(c), provided:

*Valuation.* For purposes of this Agreement, (a) every asset of the Partnership other than securities shall be valued at its fair market value in the judgment of the General Partner, as of the date as of which such valuation is to be made (the "Valuation Date"), unless this Agreement shall specifically provide a different method for valuing a particular asset in specified circumstances; and (b) securities held by the Partnership shall be valued as of the Valuation Date at an amount per share equal to the last sales price of the securities on the largest national securities exchange on which

the securities are listed or traded. The liabilities shall be determined in accordance with generally accepted accounting principles.

(Exh. 1 at 11; Exh. 2 at 4).

## C. The Promissory Security

Upon the giving of notice of withdrawal, under Section 7.2(a) of each of the Partnership Agreements, quoted above, the value of the former limited partners' interests had to be paid within 30 days thereafter. By memos dated August 29, 2001, Edelman LLC wrote to each of the former limited partners of Paper I and Papier II. Each of the August 29 memos provided: "Pursuant to the Limited Partnership Agreement, enclosed herewith please find your distribution with respect to your retirement from Paper I [or Papier II] Partners, L.P." [20]

The Petitioning Creditors were not, however, paid in cash, or with securities held by the Partnerships, such as Baumgartner shares. Enclosed with each of the August 29 Memos, as the "distribution" with respect to a limited partner's withdrawal—i.e., to satisfy the liabilities that the Partnerships owed the Petitioning Creditors—was a document denominated as a "Promissory Security." Each was identical in format, and stated, in relevant part:

The undersigned, [either Paper I or Papier II] ("Payor"), hereby promises to pay to the order of [the former limited partner] ("Payee"), in connection with Payee's withdrawal as a limited partner of Payor, the following:

(i) If the Tender Offer is consummated, an amount equal to CHF [xxx, xxx],[21] which equals CHF 1, 100 × the

---

20. Exh. P–13.

21. The Court uses "xxx, xxx" as an alternative to a specific value, as the Promissory Security

number of shares that Payee was entitled to at July 30, 2001 if Payor had been liquidated; or

(ii) If the Tender Offer is not consummated, an amount equal to CHF [xxx, xxx] (the value of Payee's interest in Payor at July 30, 2001) payable, at Payor's election, in cash or in shares of Baumgartner valued at CHF 1, 050 per share, or any combination thereof. The amount in clause (ii) above shall bear interest at the rate of 3.5% per annum and shall be payable within thirty business days after the sooner to occur of Consummation of the Tender Offer or July 31, 2002; provided, however, that the Payor may accelerate payment to an earlier date, at its election. Exh. P–13; Exh. P–14.

Whether delivery of the so-called "Promissory Security" was payment—and in particular whether this satisfied the payment obligations of Section 7.2(b) of the Agreement—is a matter of sharp dispute. For reasons set forth below in the Discussion, the Court finds as a fact, or as a mixed question of fact and law, that it was not payment, and that it did not satisfy the payment obligations of Section 7.2(b). The Court further finds, as the Petitioning Creditors argued,[22] that the "Promissory Security," instead of being the required payment to the former limited partners, was instead a forced extension of credit by the limited partners to the Partnerships. The Court additionally finds that the Petitioning Creditors did not accept the "Promissory Security" as payment.

### D. The Involuntary Petitions

On November 7, 2001 (the "Petition Date"), three of the Petitioning Creditors, Jacques Pomeranz, the Echelon Group of Companies, and ICMI Paramount Fund, L.P. II, filed an involuntary petition for relief under chapter 7 (the "Paper I Involuntary Petition") against Paper I.[23] On the same day, Lakeshore filed an involuntary petition for relief under chapter 7 (the "Papier II Involuntary Petition") against Papier II.[24] The cases have not been consolidated for administrative purposes.

On November 13, 2001, by motion initiated by order to show cause, the Petitioning Creditors moved, under section 303(g) of the Code, for the appointment of an interim trustee in each of the cases.[25] On the same day, 25 other creditors filed a Notice of Joinder with respect to the Paper I involuntary petition—thereby joining as petitioning creditors—and likewise joined in the request for appointment of an interim trustee.[26] A few days later, on November 19, 2001, each of Paper I and Papier II filed responsive affidavits and moved to dismiss the involuntary peti-

sent to each petitioning creditor set forth a different amount.

22. *See* Tr. at 199.

23. Paper I PTO at 4.

24. Papier II PTO at 4.

25. Paper I PTO at 4, Papier II PTO at 4. Section 303(g) section provides, in relevant part:

At any time after the commencement of an involuntary case under chapter 7 of this title but before an order for relief in the case, the court, on request of a party in interest, after notice to the debtor and a hearing, and if necessary to preserve the property of the estate or to prevent loss to the estate, may order the United States trustee to appoint an interim trustee under section 701 of this title to take possession of the property of the estate and to operate any business of the debtor....

26. Paper I PTO at 4.

tions.[27] After a hearing before the Court, where the Court concluded that it would be unnecessary to grant the relatively draconian relief of the appointment of an interim trustee at that time if steps could be taken to ensure that there would be no dissipation of estate assets, the Petitioning Creditors and Alleged Debtors entered into a stipulation, which was subsequently "so ordered" on February 27, 2002, to achieve that end.[28] The trial on the order for relief was held on June 18, 2002 at which time the Alleged Debtors' motion for dismissal of the cases again was considered.

### III. Facts Relevant to Section 109 Analysis

Each of the Debtors is managed by its general partner, Edelman LLC, which maintains a place of business at 717 Fifth Avenue, 15th Floor, New York, N.Y. 10022. That address is Edelman LLC's principal place of business. The Alleged Debtors' general partner, Edelman LLC, and hence the Partnerships, were parties to numerous communications,[29] and engaged in numerous acts,[30] with respect to the business of the Partnerships from the Edelman LLC offices in New York City. The offices of Edelman LLC were and are a place of business for more than "administrative" matters; they were and are a place of business for business of substance.

When Edelman LLC executed the partnership agreement in connection with the formation of Multipapiers, Edelman LLC showed its address as "c/o Edelman Group, 717 5th Avenue—New York, N.Y. 10022—USA." [31]

When each of the Partnerships pledged its shares to Credit Agricole, the signatory on its behalf (Garfinkel in each instance) designated the Pledger's (sic.) "Place" as New York, New York.[32]

In an affidavit filed in an unrelated litigation pending in the Supreme Court of the State of New York, New York County, sworn to April 6, 2001 (and filed on June 15, 2001), Mr. Edelman swore that he was a resident of the City and State of New York, and maintained his principal place of business at 717 Fifth Avenue, New York, New York.[33] He further stated that each of Messrs. Edelman, Andina, McAllister and Agranoff, members of Edelman LLC, maintained his principal offices at, and worked from, premises located at 717 Fifth Avenue, New York, New York, except for Mr. McAllister, who maintained offices in Switzerland.[34] The Court so finds. The Court further finds that the facts that Mr. Edelman maintained his principal offices at, and worked from, the premises at 717 Fifth Avenue did not change in any material respect at any time relevant to the issues here.

Neither Edelman LLC nor either of Paper I or Papier II maintains an office or

---

**27.** As noted above, the motions to dismiss, which in the Court's judgment raised disputed issues of fact and which were incapable of determination before an evidentiary hearing, were continued to the time of trial.

**28.** Paper I PTO at 4, Papier II PTO at 4.

**29.** Exhs. P–3, P–4, P–6, P–9, P–10, P–11 P–12, P–13; cf. P–5.

**30.** Exhs. P–6, P–9, P–10, P–13, P–14. In the case of Exh. P–10, Mr. Edelman's letter on

behalf of Papier II (referred to on the fax cover sheet as "Paper II") showed a typed Turks and Caicos address, but was faxed from the office of the Edelman Companies in New York.

**31.** Exh. P–27.

**32.** Exhs. P–28, P–29.

**33.** Exh. P–37, ¶ 8; Tr. 14.

**34.** Id. at ¶¶ 17–18.

telephone, or has any employees, in either Delaware, Turks and Caicos, or Luxembourg. Mr. Edelman, the controlling member of Edelman LLC, has not been to Luxembourg in the past year.[35] Nor has he been to Delaware in that time.

Edelman LLC, Paper I and Papier II each maintain a place of business in New York (more specifically, at 717 Fifth Avenue, New York City), in the United States.

Additionally, as each of Paper I and Papier II maintains books and records in New York (at least at 717 Fifth Avenue, New York City), each has property in the United States.

### IV. Facts Relevant to "Bona Fide Dispute."

The Alleged Debtors' balance sheets of November 30, 2001 showed their obligations to their former limited partners as a liability.[36] The Alleged Debtors did not present those obligations as disputed or contingent, and the obligations were presented in concrete, unliquidated amounts. The Alleged Debtors did not there (nor, so far as the record reflects, anywhere) show their obligations to the Petitioning Creditors as satisfied. Indeed, the Alleged Debtors' financial statements of November 30, 2001 were flatly to the contrary. The Court believes, and finds, that the financial statements were right; that the obligations to the Petitioning Creditors were not satisfied; and that just as the Partnerships' financial statements did not reflect that the liability to the former limited partners was disputed, the obligations were not subject to dispute, much less "bona fide" dispute.

For reasons set forth more fully in the Discussion below, the Court finds the Alleged Debtors' contentions that the Partnerships' debts to their former limited partners were paid or otherwise satisfied by the issuance of the "Promissory Security" to be wholly without support. The Court finds, as a mixed question of fact and law, that the Alleged Debtors' debts to the Petitioning Creditors were not the subject of a "bona fide dispute."

### V. Facts Relevant to the Partnerships' Debts

By November 30, 2001, the Petitioning Creditors no longer were limited partners of the two Alleged Debtors, and instead were creditors, being the beneficiaries of the liabilities in their favor imposed under Section 7.2(b) of each of the Partnership Agreements. The debts owed to them were reflected on the balance sheets of each of Paper I and Papier II as of that date.[37]

The Paper I balance sheet as of November 30, 2001 showed, as a liability, an entry "Due to Former LP's" of $4,622,698.74; the Papier II balance sheet as of November 30, 2001 showed, as a liability, an entry "Due to Limited Partners" of $1,857,374.35.[38]

These balance sheets showed the obligations to the Petitioning Creditors as debts, and properly so. Additionally, and as reflected on the two balance sheets, the proportion of the total liabilities of each of the two Alleged Debtors that was represented by the debts owing to the Petitioning Creditors was substantial. The total liabilities of Paper I as of November 30, 2001 were $6,334,877, and those of Papier

---

**35.** Paper I PTO at 4, Papier II PTO at 4.

**36.** *See* Exhs. P–23 (Paper I) and P–24 (Papier II), respectively.

**37.** Exhs. P–23 (Paper I) and P–24 (Papier II), respectively.

**38.** *Id.*

II as of that date were $2,963,111. The debt to the former limited partners of Paper I represented approximately 73% of Paper I's total liabilities, and the debt to the former limited partners of Papier II represented approximately 63% of Papier II's total liabilities.[39]

As of that November 30, 2001 date, the total assets shown for Paper I were $8,446,534, and those shown for Papier II were $5,070,303. The debt owing to the former limited partners of Paper I represented approximately 55% of Paper I's assets, and the debt owing to the former limited partners of Papier II represented approximately 37% of Papier II's assets, in each case as compared to the assets shown on the balance sheets of November 30, 2001.

With the debt to the former limited partners not having been paid when it became due (on August 29, 2001), the Court finds, as a mixed question of fact and law, that such debt was matured but unpaid, and that each of the Debtors was generally not paying its debts as they became due.

### Discussion

### I. Eligibility Under Section 109

Section 109 of the Bankruptcy Code provides, in relevant part:

> Notwithstanding any other provision of this section, a person that resides in or has a domicile, a place of business, or property in the United States .... may be a debtor under this title.

The Alleged Debtors argue that the requirements of section 109 have not been met. The Court disagrees.

Section 109 sets forth four alternate means for eligibility to be a debtor: (1) residence in the United States; (2) domicile in the United States; (3) a place of business in the United States; or (4) property in the United States. The Court finds that each of the latter two requirements has been satisfied.

### A. Place of Business

■ The Court does not need to decide, and does not decide, whether the Partnerships' *principal* place of business is in the United States, because that is not what section 109 requires. Section 109 requires that the debtor have "*a*" place of business in the United States (emphasis added). The place of business of the Partnerships' general partner, Edelman LLC, is such, and the Court has no doubt that this requirement hence has been met,[40] for each of Paper I and Papier II.

■ The findings of fact underlying the Court's determination in this regard were set out in detail above. A person has a place of business in the United States if such person conducts business in the United States or business is conducted in the United States on the person's behalf. *See In re Petition of Brierley*, 145 B.R. 151, 161 (Bankr.S.D.N.Y.1992) (English corporation had a place of business in the United States when the corporation's accountant, who was employed as an independent contractor, performed accounting functions from Arthur Andersen's offices in New York); *In re Carnera*, 6 F.Supp. 267 (D.N.Y.1933) (an Italian boxer had a principal place of business in New York, at a New York hotel, when the boxer's manager maintained files, negotiated contracts,

---

**39.** The bulk of the difference, in each case, is attributable to the margin debt owed to Credit Agricole, of $1,634,533 and $1,042,439, respectively. *See* Exhs. P–23, P–24.

**40.** *See* n. 43 below.

and paid trainers in the hotel).[41] While it is clear that the requirement is for *a place of business,* rather than *doing business,*[42] partnerships, including limited partnerships, act through their general partner(s),[43] and the evidence of the presence of the general partner (Edelman LLC) in New York, and its place of business in New York where it acted on behalf of each of the Partnerships, was overwhelming.

 The Alleged Debtors argue that section 109 has not been satisfied because their Partnership Agreements provide for a principal place of business in Luxembourg, and for registered offices in Delaware and Turks and Caicos, respectively.[44] The Alleged Debtors also contend that only "administrative functions" are performed in the United States and that no bank accounts or brokerage accounts have ever been maintained in the United States.[45] However, these contentions miss the point; they fail to address what the statute says. In a change in the law in the days since *Carnera,* section 109 of the present Bankruptcy Code does not speak of the "principal" place of business,

and the Partnerships' incantation in their organizational documents of Luxembourg, Delaware, and Turks and Caicos is not determinative of where they may actually be present. The location of a place of business (or principal place of business) is a question of fact, *see In re Bell Tower Assocs., Ltd.,* 86 B.R. 795, 799 (Bankr. S.D.N.Y.1988) and a stated locale is not conclusive. *See id.* (though limited partnership agreement and partnership prospectus stated that the Partnership's principal place of business was in Irving, Texas, movants failed to meet their burden of showing that the Debtor's principal place of business was not in New York.).

Then, even assuming, without determining, that a distinction between having a place of business with respect to "administrative" matters and a place of business with respect to more significant matters is legally significant, there is no basis for a conclusion based on that distinction here. The Court has found as a fact that the Partnerships had a place of business not merely with respect to "administrative"

**41.** The *Carnera* court found that the debtor had his *principal* place of business in the United States (which is what the law at the time required); it would necessarily follow that the lesser requirement of having *a* place of business in the United States was also satisfied.

**42.** *Cf. In re Head,* 223 B.R. 648, 651–652 (Bankr.W.D.N.Y.1998) (noting that "doing business" in the United States was not equivalent to having property here, and that "doing business" did not meet the requirements of section 109).

**43.** *See Mercier v. Saber, Inc.,* 888 F.2d 1459 (1st Cir.1989) ("the limited partnership is a quasi-corporate entity that can act only through its statutorily designated representative, the general partner"); *Currier v. Amerigas Propane, L.P.,* 144 N.H. 122, 125, 737 A.2d 1118, 1120 (1999) (same); *Star Video Entertainment, L.P. v. Video USA Associates 1*

*L.P.,* 253 N.J.Super. 216, 222, 601 A.2d 724, 727 (N.J.Super.App.Div.1992) ("[i]t is axiomatic that limited partnerships are passive entities which cannot act except through their general partners").

> As Papier II's general partner was, like Paper I's general partner, Edelman LLC—with place of business in New York—the Court sees no basis for different conclusions with respect to Papier II, based on the contention that Papier II was an "offshore" entity.

**44.** Likewise, they argue that it is significant that the Papier II Partnership Agreement provides that Edelman LLC's office for the conduct of its Papier business is located at a particular address in Providenciales, Turks and Caicos. Papier II PTO Alleged Debtor's Contentions of Fact ¶ 5.

**45.** Paper I PTO at 6, Papier II PTO at 6.

matters; the Alleged Debtors had a place of business in New York from which substantive business was conducted.[46]

Both Partnerships are, accordingly, eligible to be debtors in the United States by reason of their place of business here.

### B. Property of the Estate

■ Another of the bases by which a person can qualify as a debtor under section 109 is by having property in the United States. While the property in the United States must be real and cannot be "some type of remote or inchoate claim against property in the United States," [47] there is no statutory requirement as to the property's minimum value. *See In re McTague,* 198 B.R. 428, 432 (Bankr. W.D.N.Y.1996) ("[section 109] does not appear to be vague or ambiguous, and it seems to have such a plain meaning as to leave the Court no discretion to consider whether it was the intent of Congress to permit someone to obtain a bankruptcy discharge solely on the basis of having a dollar, a dime or a peppercorn located in the United States").

■ In that respect, original business documents are property of the estate for the purposes of section 109. *See In re Global Ocean Carriers Ltd.,* 251 B.R. 31 (Bankr.D.Del.2000) (original business documents located in the United States supported conclusion that the company held property in the United States). As noted above, the Court has found that Edelman LLC maintained original documents for each of the Alleged Debtors here, and this constitutes property in the United States sufficient to satisfy section 109.

### II. Non–Contingent Bona Fide Claims—section 303(b)

■ Under section 303(b), an involuntary case may be commenced only if the petitioning creditors hold "non-contingent bona fide" claims against the debtor. The Alleged Debtors contend that this requirement has not been satisfied. The Court disagrees.

The Court's findings of fact with respect to this issue also have been discussed above. As noted above, the Alleged Debtors' balance sheets of November 30, 2001 showed their obligations to their former limited partners as a liability. They did not present those obligations as disputed or contingent, and the obligations were presented in concrete, unliquidated amounts. The existence of the debt to the Petitioning Creditors in the amount shown on the balance sheets was not a matter of dispute, and the debt was non-contingent and bona fide.

The only remaining issue (arguably not inconsistent with showing the debt on the balance sheets) is whether the unpaid debt was yet due. The Alleged Debtors contend that their debts to the former limited partners had not yet become due, because the Partnerships substituted a new obligation (the so-called "Promissory Security"), with a later maturity date, for their obligation to pay their former limited partners on August 29, 2001. The Court rejects that contention. It has found as a fact that the Petitioning Creditors did not assent to that substitution. It likewise finds that the Partnerships had no basis, under either Partnership Agreement, to "pay" their obligations in that fashion, or

---

**46.** For that reason, and also because it is simply irrelevant, the Court is unpersuaded by the Alleged Debtors' point (Paper I PTO at 7; Papier II PTO at 7), which the Court assumes to be true, that the 717 Fifth Avenue

place of business of Edelman LLC was a place at which Edelman LLC would do business for the benefit of other entities as well.

**47.** *See Head,* 223 B.R. at 652.

to modify the maturity of their debts to their former limited partners.

Without dispute (and Mr. Edelman recognized that, in his letters of July 19),[48] under Section 7.2(b) of each of the two Partnership Agreements (quoted above), each former limited partner was entitled to receive, within 30 days after the notice of expulsion from the Partnership, the value of such limited partner's interest in the Partnership as of the applicable Withdrawal Date. The issue then is whether the former limited partners' debts were paid as required under the Partnership Agreement, which requires examination of the currency with which the Partnerships purported to do so.

The means by which the obligation could be satisfied was set forth in the third sentence of Section 7.2(c). The value of such withdrawing Limited Partner's interest could be paid "in cash, securities valued (pursuant to Section 10.4)[49] as of the date of payment, or any combination thereof, in the sole discretion of the General Partner."

The Petitioning Creditors argue that the tender of the "Promissory Security," far from paying them, required them to make forced loans to the Partnerships, and the Court agrees. Requiring the former Limited Partners to make a forced extension of credit to the Partnership was not what Section 7.2(c) authorized the Partnerships to do. Creating a new piece of paper to embody a substitute obligation, calling it a "security," and then tendering it to the former limited partners in purported satisfaction of the Partnerships' obligation,[50] did not satisfy the requirements of Section 7.2(c), whether that language is regarded as unambiguous (which this Court thinks it is), or whether it is considered in its factual context.

Looking first to the unambiguous contractual promise, "Securities," in the context in which it was there used, could not reasonably be understood to mean crafting a new obligation and calling it a "security." It necessarily meant securities already in existence that could be converted into cash, or that could fairly be regarded as a substitute for cash. That is particularly so since whatever "securities" were distributed were to be valued "pursuant to Section 10.4 as of the date of payment"—which called for consideration of "the last sales price of the securities on the largest national securities exchange on which the securities are listed or traded."

Additionally, Section 10.4, which was to provide the means of valuation of securi-

---

48. *See* Exhs. P–9, P–10.

49. Section 10.4 provided:

> *Valuation.* For purposes of this Agreement, (a) every asset of the Partnership other than securities shall be valued at its fair market value in the judgment of the General Partner, as of the date as of which such valuation is to be made (the "Valuation Date"), unless this Agreement shall specifically provide a different method for valuing a particular asset in specified circumstances; and (b) securities held by the Partnership shall be valued as of the Valuation Date at an amount per share equal to the last sales price of the securities on the largest national securities exchange on which the securities are

> listed or traded. The liabilities shall be determined in accordance with generally accepted accounting principles.
> (Exh. 1 at 11; Exh. 2 at 4).

50. The Court has already found as a fact that the Petitioning Creditors did not accept the Promissory Security as payment. They plainly did not agree to do so, and the Court does not agree that they accepted it by failing to affirmatively speak up soon enough, by allegedly remaining silent, and commencing these cases two and a half months later. It is hornbook law that silence does not constitute acceptance. *See Williston on Contracts,* § 39:35 (4th ed.2000).

ties tendered in satisfaction of the obligation under Sections 7.2(b) and 7.2(c), set forth means to value only "asset[s] of the Partnership *other than securities,*" and *"securities held by the Partnership . . . ."* (Emphasis added). Section 10.4 did not have a means for valuing other securities. The failure to provide for a means of valuation for other "securities" is entirely logical if the securities to be valued under Section 10.4 were "securities held by the Partnership." And the opposite is also true. It is wholly illogical and unpersuasive for the Partnerships to suggest that the parties agreed that the Section 7.2(c) obligation could be satisfied by the tender of some other kind of "securities" (or, worse yet, something new to be created, which was called a "security") when the parties provided for no means for valuing the "securities" or "security," if, in compliance with Section 7.2(c), the parties turned to Section 10.4.

If one regards the language of Section 7.2(c) as ambiguous and looks to the context, one reaches the same result. The assets of the Partnerships on July 30 were their "Investment in Securities";[51] the purpose of the Partnerships was:

> "to acquire . . . *securities of every nature and description* (including options) of a specific entity, the name and business of which each Limited Partner acknowledges he is familiar, and any affiliated entities (the '*Securities'*), and to hold, sell . . . and otherwise exercise all rights, powers, privileges and other incidents of ownership or possession with respect to *the Securities and other assets owned by the Partnership* . . . ."

Plainly, in this context, the third sentence of Section 7.2(c) can only be understood to refer to an in-kind distribution of the securities—e.g., Baumgartner shares—that were the Partnerships' most significant asset and reason for being. And once more consideration of the cross-reference to Section 10.4 is both consistent with, and compels, that view.

Thus the tender of the "Promissory Security" in purported satisfaction of the Partnerships' obligations—which, the Court once more notes, was not valued pursuant to Section 10.4 as of the date of payment in an amount equal to the debt[52] —was not in compliance with the third sentence of Section 7.2(c), requiring payment in "cash, securities valued pursuant to section 10.4 as of the date of payment, or any combination thereof." The debts to the former limited partners were neither satisfied nor extended with the delivery of the "Promissory Security" on August 29, 2001.

■ A bona fide dispute regarding claims exists when there is an objective basis for either a substantial factual or legal dispute as to the validity of the debt. *See In re Elsa Designs, Ltd.,* 155 B.R. 859, 864 (Bankr.S.D.N.Y.1993) (Brozman, C.J.). Here there is no objective basis for a factual or legal disagreement about the validity of the debt, and especially a "substantial" one. It was not the intention of Congress that a debtor be able to avoid bankruptcy by merely disputing the existence or amount of a claim. *Id.* at 871. There is no bona fide dispute here.

---

**51.** *See* Exhs. P–16, P–17, the balance sheets of that date.

**52.** Of course, only "securities held by the Partnership" were subject to this last requirement, and the "Promissory Security" was not such, but any "securities" tendered in satisfaction of the Section 7.2(c) obligation still had to be valued pursuant to Section 10.4 This once more underscores why providing such a "Promissory Security" could not be deemed to satisfy the requirements of Section 7.2(c).

*III. Generally Paying Debts as They Become Due.*

■ Section 303—and in particular, section 303(h)(1)—further provides that the Court shall order relief against the debtor in an involuntary case only if the debtor is generally not paying its debts as such debts become due. As noted above, under 7.2(b) of the Partnership Agreements, the Partnerships' debts to the former limited partners came due on August 29, 2001, thirty days after July 30, 2001 (the date on which the general partner required the former limited partners to withdraw), and as the Court has found above, the debts to the former limited partners were not satisfied on that date, by the issuance of the "Promissory Security" or otherwise.

■ Accordingly, the Court then must determine whether the debtor was "generally" not paying its debts as such became due. That issue is determined by several factors. Courts look at the number of claims that the debtor has not paid, the amounts of these unpaid claims, the materiality of the non-payments, and the debtor's overall financial condition and affairs. *See, e.g., Crown Heights Jewish Community Council v. Fischer,* 202 B.R. 341, 344 (E.D.N.Y.1996) (debtor was generally not paying its debts when it had failed to pay two money judgments of $2,155,465.76 and $275). The Court may also look at whether the debtor has terminated its business operations entirely, and whether the past debts that are due are extremely large in comparison to the debtor's assets. *In re B.D. Int'l Discount Corp.,* 701 F.2d 1071, 1074 (2d Cir.1983) (debtor was generally not paying its debts as the debts became due when debtor had terminated its business operations completely, and its unpaid debts were extremely large compared to the debtor's assets).

In light of an apparent lack of dispute that the tender offer has now been terminated,[53] the first of those B.D. Int'l Discount factors appears to be applicable, and, more importantly, the second one unquestionably is. In this case, the number of claims for matured and unpaid debt is quite large, though more so in Paper I—28 in Paper I, and 2 in Papier II (one of whom was a petitioning creditor).[54] The amount of the matured and unpaid debt is large in both cases. Debt in Paper I that is unpaid exceeds $4.6 million,[55] and unpaid debt in Papier II is more than $1.8 million.[56]

■ Courts examine the matured and unpaid debt in the context of its size in proportion to the assets of a debtor, and its size in proportion to the other debt. The matured and unpaid debt here is very large in each context. The matured and unpaid debt is equal in amount to the approximately 55% of the value of the total assets of Paper I, and approximately 37% of the total assets of Papier II.[57] It also is large in the context of the total debt of each entity—representing approximately 73% of the total debt of Paper I, and 63% of the debt of Papier II—in each case also taking into account each Partnership's only other material debt, margin debt owed to Credit Agricole, in the amount $1.9 million

---

**53.** *See* Tr. at 90.

**54.** *See* Exh. P–22. Papier II had a much smaller number of potential claimants—only 2 former limited partners, and Papier II has not argued that it has 12 or more creditors, and hence that the 1 petitioning creditor in its case was insufficient.

**55.** *See* Exh. P–23.

**56.** *See* Exh. P–24.

**57.** *See* page 672 above.

with respect to Paper I, and $1.2 million with respect to Papier II.[58]

The Alleged Debtors argue that they are "solvent" (presumably on a test that would measure assets against liabilities), though the Court is not necessarily persuaded that this is the case, especially in the case of Paper I. But in any event, that is not the test, as that argument does not address what section 303 says. Once the Court has determined that the claims held by the petitioning creditors are noncontingent and not subject to bona fide dispute, the statutory inquiry is whether the alleged debtor is generally not paying its debts as such debts become due. Once it is determined, as this Court did above, that the debt owing to the former limited partners of each of the two Partnerships is matured and unpaid, this issue is straightforward. Looking at the totality of circumstances, the failure of Paper I and Papier II to pay debts of such magnitude plainly constituted a failure generally to pay debts. The Court concludes that the requirement of section 303(h)(1) that the Alleged Debtors are "not generally paying their debts as they mature" easily has been satisfied.

*IV. Abstention or Dismissal—Section 305*

The Alleged Debtors further argue that the Court should abstain from or dismiss the involuntary petitions pursuant to section 305 of the Bankruptcy Code.[59] Section 305 of the Code provides, in relevant part:

The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—

(1) the interests of creditors and the debtor would be better served by such dismissal or suspension.... [60]

■■■ Although it has the discretion to do so, the Court believes it should not abstain and dismiss this involuntary case. A motion under section 305(a) to dismiss a petition or suspend the bankruptcy case is a form of extraordinary relief. *In re RCM Global Long Term Capital Appreciation Fund, Ltd.*, 200 B.R. 514, 525 (Bankr. S.D.N.Y.1996) ("*RCM*") (Brozman, C.J.). Abstention pursuant to section 305 of the Code is a power that should only be utilized under extraordinary circumstances. *See In re Grigoli*, 151 B.R. 314, 319 (Bankr.E.D.N.Y.1993) (Duberstein, C.J.) (denying a request for abstention by two creditors holding 55% of estate's claims where the interests of the debtor and creditors were best served through involuntary Chapter 7 case, and noting earlier authority that Congress had indicated that it intended section 305(a) dismissals to be the exception rather than the rule). While no uniform test has been established in connection with determinations as to whether abstention is appropriate, early cases noted that three were relevant:

(1) Whether the petition was filed by a small number of creditors and most creditors oppose the bankruptcy;

(2) Whether there is a state insolvency proceeding or other out-of-court arrangement pending; and

(3) Whether dismissal is in the best interests of the debtors and all creditors.[61]

---

**58.** *See* page 672 above.

**59.** *See* Paper I PTO at 9, Papier II PTO at 9.

**60.** A second basis for abstention, the pendency of a foreign insolvency proceeding, plainly is inapplicable here.

**61.** *See In re Trina Associates*, 128 B.R. 858, 867 (Bankr.E.D.N.Y.1991) (Duberstein, C.J.).

▇▇▇ Later cases enlarged the list of factors that would be considered. In this district, Chief Judge Brozman of this Court, in *RCM*, *see* 200 B.R. at 524, considered the broader set of factors considered by the court in *In re 801 South Wells Street, L.P.*, 192 B.R. 718, 723 (Bankr. N.D.Ill.1996). These factors were:

(1) economy and efficiency of administration;

(2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;

(3) whether federal proceedings are necessary to reach a just and equitable solution;

(4) whether there is an alternative means of achieving an equitable distribution of assets;

(5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;

(6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and

(7) the purpose for which bankruptcy jurisdiction has been sought.

*See 801 South Wells*, 192 B.R. at 723. Of these, at least in this district, the first is a primary consideration. *See RCM*, 200 B.R. at 525.

▇▇▇ The Court considers it appropriate to analyze the issues here as did Judge Brozman, applying the *801 Wells Street* factors. Doing so here, the Court sees no basis for abstention. Taking them in order:

(1) Economy and efficiency are served where the Alleged Debtor's general partner itself is in New York, the creditors themselves have picked this forum, creditors need not go around the country or the world to obtain relief, and where assets can be distributed in a pari passu manner, without races to obtain judgments;

(2) There is no proceeding elsewhere, and no other forum has been shown to be available to protect creditor interests;[62]

(3) Federal proceedings are at least desirable, to ensure pari passu distribution;

(4) There is no apparent alternative means to achieve an equitable distribution of assets;

(5) Efforts to work out a less expensive out-of-court arrangement have failed;

(6) No non-federal insolvency proceeding has been commenced at all, much less has it proceeded so far that it would be costly and time consuming to start afresh here; and

(7) The purposes for which bankruptcy jurisdiction has been sought seem to this Court to be the understandable desire of creditors to be paid; this is not a case, in the Court's view (despite arguments to the contrary), where parties are fighting for the control of an enterprise.[63]

Likewise, even if the older factors were considered, the conclusion would be no different. The number of petitioning creditors is hardly small—indeed it is unusually large—in Paper I, and no other creditors

---

**62.** The Court does not regard the Alleged Debtors' suggestions of sending creditors to Delaware, Luxembourg or Turks and Caicos to be persuasive in this regard.

**63.** The former limited partners are now out of their respective partnerships. Their interest at this point is simply in securing payment of the debts that are due to them.

have appeared in either case in opposition. Rather, the only objector has been Edelman LLC, on behalf of the Partnerships' management and the interests of that management and/or other partners, at the *equity* level—interests that, under the Code, are subordinate to those of creditors. Given the unsatisfied claims of the Partnerships' creditors, the Court does not see how it can disregard creditors' needs and concerns to suit the preferences of management or equity.

In short, there is nothing in the facts here warranting the "extraordinary relief," *RCM*, 200 B.R. at 525, of abstention under section 305.

## V. Bad Faith Filing

■■■ Lastly, the Alleged Debtors contend that the Petitioning Creditors have filed this petition in bad faith. The Court finds this contention to be without merit. The Petitioning Creditors, in addition to arguing a lack of bad faith of any kind, seemingly argue that courts consider this factor only when there is pending litigation between the parties, and the dispute is over control of a business or asset.[64] While the Court is not convinced that the applicable standard is quite that narrow, the Court agrees that the interest of a creditor in getting paid is not, by itself, properly regarded as bad faith. Also, even if there were what could be regarded as a two party dispute here, that by itself would not show bad faith filing. *See In re C–TC 9th Avenue Partnership*, 113 F.3d 1304, 1311 (2nd Cir.1997) (listing existence of two-party dispute as one of eight factors indicative of bad faith filing of chapter 11 case).

Finally, though this is in part a debatable matter of characterization, the Court does not see this as a two-party dispute,

and finds, as a mixed question of fact and law, that it is not. Here there are *29* petitioning creditors. The filings here were occasioned by an intentional, and systematic, effort on the part of the Alleged Debtors' general partner to avoid the payment of debts of the Partnerships to many of the Partnerships' creditors. The "dispute," if an intentional failure to pay one's debts can be regarded as such, was not between a debtor and one or two other parties, but at least 29 parties, holding 73% of the debt of one debtor and 63% of the debt of the other.

### Conclusion

An order for relief against the Alleged Debtors in each of these involuntary cases under chapter 7 of the Bankruptcy Code will be entered.

The Petitioning Creditors will settle an order on two business days' notice.

---

**64.** Petitioning Creditors Br. at 16.